Dennis J. FITZPATRICK, doing
business as F.E.L. Publications,
Plaintiff–Appellant,

v.

CATHOLIC BISHOP OF CHICAGO, a
corporation, Defendant–Appellee.

No. 89–2966.

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1990.

Decided Oct. 25, 1990.

Dennis J. Fitzpatrick, Las Vegas, Nev., pro se.

Lee N. Abrams, George Vurdelja, Mayer, Brown & Platt, Chicago, Ill., for defendant-appellee.

Before WOOD, Jr., CUDAHY and POSNER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Dennis J. Fitzpatrick brings his second appeal to this court. A complete summary of the facts appears in our previous opinion, *see F.E.L. Publications v. Catholic Bishop*, 754 F.2d 216 (7th Cir.), *cert. denied*, 474 U.S. 824, 106 S.Ct. 79, 88 L.Ed.2d 64 (1985), but we will only develop the facts as necessary for our disposition of the case. The parties agree that Illinois law controls.

Operating under the aegis of F.E.L. Publications, Ltd., Fitzpatrick was a successful publisher of religious music for Roman Catholic liturgies. In fact, Fitzpatrick was so successful that, with little regard for the copyright laws, religious groups often copied his music. Some of these groups were controlled by the Roman Catholic Archdiocese of Chicago, which soon found itself on the wrong end of a September 1976 lawsuit by F.E.L. Publications for copyright infringement. At the same time, F.E.L. Publications sent letters to all other Roman Catholic dioceses in the United States threatening litigation for copyright infringement.

In October 1976, Monsignor Brackin, the Vicar General of the Chicago archdiocese, sent two letters to institutions within his jurisdiction. These letters mentioned the pending litigation and asked that all use of F.E.L. materials cease immediately. Monsignor Brackin also requested that all F.E.L. materials be turned over to archdiocesan officials. In response to inquiries from other Roman Catholic clergy, Monsignor Brackin mailed copies of these letters to all dioceses in the United States. Monsignor Brackin's mailings are at the heart of this lawsuit.

After Monsignor Brackin sent his letters, F.E.L. experienced a sharp decline in sales whereas other publishers of liturgical music gained market share. Today, F.E.L. is no longer in business. Consequently, F.E.L. added a tortious interference with contractual relations count to its copyright suit. Specifically, F.E.L. claimed that the Chicago archdiocese's ban on F.E.L. music interfered with actual and prospective contractual relations with Roman Catholic parishes and other institutions both within and without the Chicago archdiocese. The focus of F.E.L.'s suit is Monsignor Brackin's letters about the ban that were mailed to third parties outside the Archdiocese of Chicago.

The copyright and tortious interference claims went to trial. The Chicago archdiocese admitted liability for copyright infringement but contested the tort count. The result was a verdict for F.E.L. in the amount of $190,400 for copyright infringement and $2 million in actual damages and $1 million in punitive damages for the Chicago archdiocese's interference with F.E.L.'s contractual relations. On appeal, we affirmed that part of the district court's judgment relating to the copyright claim. 754 F.2d at 218–20. As to the tort claim, however, we found that the Archdiocese of Chicago and its parishes were the same entity, meaning that the archdiocese could only be liable for interference with contractual relations outside its borders. *Id.* at 220–22. Because we were "unable to determine from the record before us ... what amount of the jury's tortious interference award was impermissibly based on the Catholic Bishop's conduct toward its own parishes and what amount, if any, was based on its actions involving dioceses outside Chicago," we reversed and remanded for further proceedings. *Id.* at 222.

The further proceedings ended in August 1989, when the district court granted summary judgment to the defendant. The district court found that F.E.L. had failed to come forward with any evidence indicating that Monsignor Brackin's letters caused its dramatic decline in sales. Furthermore, the defendant had produced affidavits from twenty-four representatives of organizations that terminated their relationship

with F.E.L. after Monsignor Brackin had sent his letters. Each affiant stated that the termination of their organization's business relationship with F.E.L. had nothing to do with the conduct of Monsignor Brackin or the Archdiocese of Chicago. Taking these facts into consideration, the district court concluded that summary judgment would be appropriate because the plaintiff would be unable to prove the essential element of causation at trial.

■ When this suit was brought, F.E.L. Publications was a corporate entity, but it has since been dissolved and its claims assigned to its owner, Dennis J. Fitzpatrick. The plaintiff informed the district court of this name change, and the caption has since been altered to reflect the plaintiff's correct name. The district court's judgment refers only to F.E.L. Publications, but we reject the defendant's contention that the plaintiff's notice of appeal, which specifies the appellant as "Dennis J. Fitzpatrick, doing business as F.E.L. Publications," is inadequate. It is clear that "F.E.L. Publications" and "Dennis J. Fitzpatrick" are now alternative names for the same entity.

■ To establish a claim for tortious interference with contractual relations in Illinois, a plaintiff has to prove five elements: (1) a valid contract, (2) defendant's knowledge of the contract's existence, (3) an intentional and malicious inducement of the breach of contract, (4) breach of contract caused by the defendant's wrongful conduct, and (5) resultant damage to the plaintiff. *George A. Fuller Co. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1330 (7th Cir.1983) (quoting *Swager v. Couri*, 60 Ill.App.3d 192, 196, 376 N.E.2d 456, 459, 17 Ill.Dec. 457, 460 (1978), *aff'd*, 77 Ill.2d 173, 395 N.E.2d 921, 32 Ill.Dec. 540 (1979)); *Ntron Int'l Sales Co. v. Carroll*, 714 F.Supp. 335, 339 (N.D.Ill.1989). We agree with the district court that F.E.L. has failed to show the fourth element, causation.

■ In our previous opinion, we disagreed "that the evidence was insufficient to allow recovery for tortious interference with F.E.L.'s business outside Chicago." 754 F.2d at 221. Invoking the law of the case doctrine, the plaintiff now argues that this one phrase out of a six-page opinion entitles him to go to a jury with his evidence. The plaintiff's reading of our prior ruling is rather cramped. We made it clear that further proceedings were required because it was impossible for us, as a reviewing court, to separate the evidence that showed tortious interference with F.E.L.'s business within and without the Chicago archdiocese. On remand, the trial court was to determine what amount of the tortious interference, *if any*, occurred outside Chicago. *Id.* at 222. Our prior holding simply does not support the plaintiff's position.

■ Moving to the substance of the case, the plaintiff admonishes us about the favorable treatment he must receive as the nonmoving party for summary judgment. The plaintiff neglects, however, the relatively recent Supreme Court precedent placing an affirmative burden even on the nonmoving party. Where the nonmoving party fails to make a showing sufficient to establish the existence of an essential element on which he would bear the burden of proof at trial, summary judgment should be entered against him. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is no requirement that the moving party negate his opponent's claim. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion.

All twenty-four affiants contacted by the Chicago archdiocese swore either that their organizations were unaware of Monsignor Brackin's letters or that they considered other factors in terminating their business relations with F.E.L. These affidavits strongly suggest that F.E.L. would be unable to prove at trial a direct link between its business decline and the defendant's actions. While the plaintiff quibbles with the Chicago archdiocese's selection of affiants, he has not pointed us toward contra-

dictory evidence as he must to defeat the summary judgment motion. In addition, F.E.L. contends that by focusing on its licensing customers, the defendant has overlooked vast portions of its business relating to hymnal sales, but F.E.L. fails to advance evidence showing that customers who bought F.E.L. hymnals were any less unaware of Monsignor Brackin's letters than customers who satisfied their music needs by purchasing licenses to use F.E.L. music.

Put plainly, there is a dearth of evidence to support the plaintiff's case. At the first trial, an expert on the liturgical music market testified that F.E.L.'s reputation suffered because of its problems with the Chicago archdiocese. This testimony was phrased only in the most general and vague of terms, not linking the reaction of any particular F.E.L. customer to conduct of the defendant, making it at least as likely that the damage to F.E.L.'s reputation was due to its own hard-line litigious stance about protecting its copyrights. A second possible but unavailing piece of evidence to show causation is the Chicago archdiocese's confiscation of F.E.L. materials from institutions in the Chicago area but beyond the pale of the archdiocese's authority. At the district court, F.E.L. focused solely on the effect of Monsignor Brackin's letters, leading to a possible waiver problem with asserting in this court that other actions of the defendant caused F.E.L.'s decline. More fundamentally, F.E.L. has failed to relate the seizure to its business woes. It is not clear how the defendant's taking of F.E.L. materials from third parties would cause these third parties to cease doing business with F.E.L. If anything, it would give F.E.L. new business opportunities when the third parties searched for replacement music.

■ What is left is a coincidence in timing. F.E.L.'s business dropped off at about the same time the Chicago archdiocese banned the use of F.E.L. materials. Mr. Fitzpatrick's loss of his business, which he undoubtedly worked hard to build, is regrettable, but the tort of interference with contractual relations is not insurance

against business failure. F.E.L. might have failed for many reasons, not the least of which might be a religious institution's preference to deal with suppliers of liturgical music that have not threatened to sue their customers. Absent a causal link between the defendant's actions and the plaintiff's loss, tort liability is usually not imposed. Combining the lack of evidence in favor of F.E.L. with the affidavits that tend to negate F.E.L.'s claim leads to the conclusion that F.E.L. would be unable to prevail at trial on the issue of causation. Summary judgment for the defendant was appropriate. *See Baucher v. Indiana Prod. Credit Ass'n,* 906 F.2d 332, 334–35 (7th Cir.1990). The judgment of the district court is

Affirmed.