William **DANIELS** and Judy Daniels, Plaintiffs,

v.

## The AREA PLAN COMMISSION OF ALLEN COUNTY, HNS Enterprises LLP, and LST LLC, Defendants.

### No. Civ. 1:00CV157.

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 19, 2000.

John C. Theisen, Matthew M. Hohman, Barnes and Thornburg, Fort Wayne, IN, for plaintiffs.

R. John Wray, Wray and Associates, Fort Wayne, IN, for The Area Plan Commission of Allen County, defendant.

Laura L. Reuss, Beers Mallers Backs and Salin, Fort Wayne, IN, for LST LLC, defendant.

## ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the court on two motions for summary judgment. The first motion was filed by one of the defendants, the Area Plan Commission of Allen County ("Plan Commission"), on September 12, 2000. The second motion was filed by the plaintiffs, William Daniels and Judy Daniels (collectively "the Daniels"), on October 12, 2000. Also before the court is a motion to strike portions of the affidavit of Charles J. Bodenhafer, filed by the Daniels on October 12, 2000. The parties completed briefing the motions on November 27, 2000.[1] For the following reasons, the motion to strike will be granted, the Daniels' motion for summary judgment will be granted, and the Plan Commission's motion for summary judgment will be denied.

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party ne-

---

1. Counsel for the Daniels is to be commended for the high quality of the briefs submitted on behalf of the Daniels.

gate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,*.916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id. In re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact", *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment.

*Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. *See, Waldridge v. American Hoechst Corp. et al.,* 24 F.3d 918 (7th Cir.1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–51, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the materi-

al facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

## Discussion

On April 13, 2000, the Daniels filed a "Complaint for Declaratory Relief and Permanent Injunction". The Daniels indicate in their complaint that they are the owners of property located at 1735 Broadmoor Avenue in Fort Wayne, Indiana. This property is part of the subdivision commonly known as the Broadmoor Addition. The Daniels' property is lot number 58 of Broadmoor Addition. The plat of Broadmoor Addition contains the following restrictive covenant:

> No building other than a single family dwelling and a private garage shall be built on any one lot.

Defendants HNS Enterprises, LLC ("HNS") and LST, LLC ("LST") are the owners of lots 3 through 5 of Broadmoor Addition. On or about October 1, 1999, HNS and LST petitioned the Plan Commission to vacate lots 3–5 of Broadmoor Addition from the plat of Broadmoor Addition. HNS and LST also requested that the Plan Commission approve the rezoning of lots 3–5 of Broadmoor Addition. Broadmoor Addition at that time was zoned RS–1/Suburban Residential. HNS and LST requested that lots 3–5 of Broadmoor Addition be zoned C–2A/Neighborhood Shopping Center. HNS and LST also requested that the Plan Commission approve their primary development plan for the building of a shopping center on lots 3–5 of Broadmoor Addition (the "Broadmoor Shops").

The Plan Commission initially scheduled a public hearing on all of the requests for November 18, 1999. Counsel for HNS and LST requested that their petitions be continued until a public hearing scheduled for December 9, 1999. At the December 9, 1999 public hearing, numerous residents of Broadmoor Addition objected to the granting of any of the requests. Counsel for the Daniels appeared at this hearing and argued that the Plan Commission did not have the authority to remove the restrictive covenants requiring that all buildings built within Broadmoor Addition be single family residential homes. Counsel for the Daniels also argued that the vacation and rezoning of lots 3–5 of Broadmoor Addition would constitute an unconstitutional taking of private property for a private use. Nevertheless, at a meeting on January 20, 2000, the Plan Commission adopted a "do pass" recommendation to the rezoning petition. The Plan Commission also granted conditional approval to the vacation of lots 3–5 of the Broadmoor Addition and for the approval of the primary development plan for the Broadmoor Shops.

As a result, the Daniels brought the present action, alleging that the Plan Commission's actions violated 42 U.S.C. § 1983. The Daniels assert that the Plan Commission's approval of the requested vacation, rezoning and the primary development plan has caused the restrictive covenants of Broadmoor Addition to be removed from lots 3–5 thereof. The Daniels claim that the Plan Commission's actions constitute a governmental taking of private property owned by them for a private use, in violation of the Fifth and Fourteenth

Amendments of the United States Constitution and the Indiana Constitution.[2]

The Daniels request that this court enter a declaratory judgment finding that the Plan Commission has committed a violation of § 1983 and has violated the Federal and State Constitutional rights of the Daniels by removing the restrictive covenants from lots 3–5 of the Broadmoor Addition[3], enter a declaratory judgment that the restrictive covenant running with the land limiting the use of lots 3–5 of the Broadmoor Addition to single family residences remains in full force and effect and that the acts of the Plan Commission purporting to vacate the restrictive covenant is void, and enter a permanent injunction ordering the Plan Commission to reverse the approval of the HNS/LST petition and prohibit the Plan Commission from removing the restrictive covenants contained in the plat of Broadmoor Addition for any private purpose[4].

On April 25, 2000, the Plan Commission filed a motion to dismiss, arguing that the Daniels failed to exhaust their administrative remedies and have failed to allege damages (and should bring an inverse condemnation action if they wish to allege damages). In an order filed June 21, 2000, this court denied the Plan Commission's motion to dismiss, finding that exhaustion of administration remedies (assuming such remedies are even available to the Daniels)

is not required. *See Patsy v. Board of Regents of Florida,* 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) ("Based on the legislative histories of both § 1983 and § 1997e, we conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983"). This court further held that the parties had raised substantial factual and policy issues which were not appropriately disposed of in a motion to dismiss. Order at 4, 5. The parties subsequently filed cross motions for summary judgment.

As the Plan Commission's motion for summary judgment relies heavily upon the affidavit of Charles J. Bodenhafer, the court will first rule on the Daniels' motion to strike portions of that affidavit[5]. The Daniels specifically request that the court strike paragraphs 4, 5, 8–13, and 15 of Bodenhafer's Affidavit.

In paragraph 4, Bodenhafer states that he and "the other members of the Allen County Plan Commission are familiar with the real estate." The Daniels argue that Bodenhafer cannot have personal knowledge as to the familiarity of each of the members of the Plan Commission with respect to the real estate. The Plan Commission, however, assert that Bodenhafer is the President of the Plan Commission, and that his affidavit establishes

2. It is undisputed that a restrictive covenant constitutes a constitutionally protected property right. *Pulos v. James,* 261 Ind. 279, 302 N.E.2d 768, 771 (1973). A restrictive covenant "creates a property right in each grantee and subsequent grantee of a lot in the plat subject to the restriction." *Id.* (citing *Wischmeyer v. Finch,* 231 Ind. 282, 107 N.E.2d 661 (1952)).

3. On October 4, 2000, pursuant to 28 U.S.C. § 2403, this court, upon motion by the Daniels, certified the question of the constitutionality of Indiana Code § 36–7–3–11 to the Attorney General of Indiana. On October 25, 2000, the Attorney General of Indiana filed a Notice of Appearance "only on matters related to constitutional challenges." However, the Attorney General of Indiana has not filed any motions or briefs in this case.

4. The Daniels have also requested that the Plan Commission be required to pay the fees and costs incurred by them in bringing this action. After entry of this order, the Daniels should file a separate fee petition supported by authority and evidence (*i.e.,* time sheets and attorney affidavits).

5. As the focus of this case is on the alleged unconstitutionality of Indiana Code § 36–7–3–11, the Bodenhafer Affidavit is not particularly relevant to the court's final analysis and decision. However, as the parties have thoroughly briefed the issues in the motion to strike, the court will proceed with a discussion of the issued raised.

that he attended both sessions with regard to the subject real estate, is familiar with the evidence presented, and is familiar with the subject real estate. The Plan Commission maintains that Bodenhafer observed the other members' discussions on the record revealing to him the fact that the other members were knowledgeable and familiar with the real estate. The Daniels, in reply, point out that the Plan Commission does not state whether any members of the Plan Commission visited the real estate at issue or the concrete facts establishing Bodenhafer's knowledge of the real estate. The Daniels argue that without this information, Bodenhafer cannot testify to his or the other members' familiarity with the real estate. The Daniels further argue that to the extent Bodenhafer's alleged "personal knowledge" of other members' familiarities is based upon what he was told by these members, Bodenhafer's assertion is also inadmissible hearsay. Clearly, the Daniels are correct on both points. Bodenhafer failed to set forth the basis for his personal knowledge regarding the real estate, or regarding other members' familiarity of the real estate. Moreover, Bodenhafer may not rely on hearsay to support his asserted knowledge of other members' familiarity with the real estate. Accordingly, paragraph 4 will be stricken.

█ In paragraph 5 of his affidavit, Bodenhafer states that the evidence (testimony and photographs) presented at the public hearing "clearly showed that there existed three uninhabited deteriorating residential structures on the real estate." The Daniels assert that Bodenhafer's allegation that the evidence "clearly showed" the condition of the structures on the real estate is nothing more than a conclusory allegation not based upon Bodenhafer's personal knowledge. The Daniels point out that Bodenhafer does not explain what

about the evidence showed that the structures were uninhabited or deteriorating. In response, the Plan Commission claims that the fact is that the evidence does show there were uninhabited deteriorating residential structures. The Plan Commission cites to the application for vacation, which states that there were "some run down residential structures", and to photographs which purportedly show uninhabited deteriorating residential structures [6]. The Daniels, however, argue that this "evidence" is simply inadmissible hearsay, as someone else told Bodenhafer that there were three uninhabited deteriorating structures on the property and he is merely restating their statement. This court agrees with the Daniels that paragraph 5 of Bodenhafer Affidavit consists of inadmissible hearsay, and the paragraph will be stricken.

In paragraph 8 of his affidavit, Bodenhafer states that Lima Road in the vicinity of the real estate has changed significantly in the past sixty years. The Daniels have moved to strike this paragraph for lack of personal knowledge. The Daniels claim that paragraph 8 is a bald assertion as to the general truth that changes have allegedly occurred to Lima Road without citation to concrete facts. In response, the Plan Commission claims that the fact of Bodenhafer's familiarity with the site, his expertise as the President of the Plan Commission, his knowledge of the evidence submitted at the public hearing and his knowledge of the arguments and discussions all are sources of the fact that "Lima Road in the vicinity of the real estate has changed significantly in the past sixty years." The Plan Commission also argues that the evidence submitted by the Daniels, a document attached to an affidavit by Matthew Hohman, supports the fact that the area in question has undergone signifi-

6. The pictures which are attached as Exhibits to the Bodenhafer Affidavit are black & white photocopies of photographs and do not show sufficient detail to determine whether the structures are uninhabited and/or deteriorat-

ing. The Daniels have indicated that the buildings were not uninhabited until after they were purchased by HNS as part of HNS's plan to construct a shopping center on the lots.

cant changes. This document is a real estate listing for the vacated lots and states that the Lima Road area experiences over 30,000 cars daily and is growing at a very rapid rate. As the Daniels point out, however, the truth of Bodenhafer's statement is not being challenged by the motion to strike. Rather, Bodenhafer's personal knowledge of the facts contained in his statement is being challenged. As Bodenhafer has not established his familiarity with the site or how his role as President of the Plan Commission gives him personal knowledge of the changes in the vicinity of Lima Road, or even that he knew about the real estate listing describing the traffic on Lima Road, paragraph 8 of his affidavit must be stricken.

■ In paragraph 9 of his affidavit, Bodenhafer states that the Plan Commission expects a transition of land use on Lima Road to continue and that the Plan Commission is planning for such a transition. The Daniels object to this paragraph because Bodenhafer does not state the source of his personal knowledge, but rather makes a bald assertion of the general truth of what he expects to occur. Again, the Plan Commission argues that Bodenhafer has personal knowledge of the transition of land use on Lima Road because of his "familiarity with the site, his expertise as the President of the Plan Commission," and his knowledge of the evidence and arguments made at the vacation hearing. However, it is clear that Bodenhafer has not established his familiarity with the site or how his role as President of the Plan Commission gives him personal knowledge of the changes in the vicinity of Lima Road. Moreover, as the Daniels note, to the extent Bodenhafer relies upon the evidence and testimony presented at the hearing, he relies upon inadmissible hearsay. Consequently, paragraph 9 of the Bodenhafer Affidavit will be stricken.

7. In its findings, the Commission determined that "nearby commercial development and increased traffic along Lima Road have made

■ In paragraph 10, Bodenhafer testifies that the members of the Plan Commission discussed and decided that based on the evidence, lots 3–5 of Broadmoor Addition would never again be used for residential purposes. The Daniels request that this paragraph be stricken, arguing that Bodenhafer's statement is a conclusory statement admittedly based upon the opinion of members of the Plan Commission. The Daniels further argue that the statement is directly contradicted by the findings of the Commission that are attached to Bodenhafer's affidavit as Exhibit C.[7] The Daniels object to Bodenhafer's statement being used as evidence to establish that the real estate will never be used again for residential purposes. In response, the Plan Commission again argues that Bodenhafer has personal knowledge of the transition of land use on Lima Road because of his "familiarity with the site, his expertise as the President of the Plan Commission," and his knowledge of the evidence and arguments made at the vacation hearing. It is clear that Bodenhafer has not established his familiarity with the site or how his role as President of the Plan Commission gives him personal knowledge of the changes in the vicinity of Lima Road. Furthermore, to the extent he relies upon the evidence and testimony presented at the hearing, he relies upon inadmissible hearsay. Accordingly, paragraph 10 of the Bodenhafer Affidavit will be stricken.

■ In paragraph 11, Bodenhafer states that the evidence presented in the public hearings "clearly showed" that the value of the remaining lots in the Broadmoor Addition would not be diminished by vacation of the restrictive covenants. The Daniels argue that Bodenhafer has offered no more than his opinion as to what the evidence at the hearing showed. The Daniels maintain that Bodenhafer's statement in paragraph 11 is not based upon fact, but is

this property less desirable for residential use."

based solely upon Bodenhafer's opinion and interpretation of the evidence. The Plan Commission argues in a conclusory fashion that Bodenhafer's statement is based on facts and is not mere opinion and interpretation of evidence. The Plan Commission claims that it is its duty as the administrative agency to interpret the evidence presented at a hearing, and that Bodenhafer is knowledgeable of that administrative agency's interpretation and decision. The issue, however, is not whether Bodenhafer has personal knowledge of the agency's interpretation and decision. The issue is whether Bodenhafer is competent to testify as to what the evidence "clearly showed." The evidence speaks for itself, and any interpretation of the evidence by Bodenhafer is simply an inadmissible opinion. Therefore, paragraph 11 of the Bodenhafer Affidavit will be stricken.

■ In paragraph 12 of his affidavit, Bodenhafer lists seven reasons why the Plan Commission decided it was in the best interest of the public to vacate the restrictive covenants and allow the removal of "three uninhabited deteriorating residential structures". The reasons listed in the Bodenhafer Affidavit are that the existence of those structures:

(1) Impairs the aesthetics of the community,

(2) Diminishes the value of the remaining lots in the Broadmoor Addition,

(3) Creates unsafe conditions for the children of the Broadmoor Addition,

(4) Creates blight on a major thoroughfare of the community,

(5) Impairs the economic development of the community,

(6) Impairs the tax base of our community, and

(7) Impairs the use of the real estate to its highest and best use.

The Daniels argue that none of the seven stated reasons appear in the Plan Commission's findings. The Daniels further assert that the seven reasons Bodenhafer gives

as to why the Plan Commission decided it was in the best interest of the public to vacate the restrictive covenants directly contradict the Commission's findings and are nothing more than conclusory self-serving statements made after the Plan Commission issued its findings. In response, the Plan Commission argues that Bodenhafer's expertise allows him to testify as to the policy reasons behind the Plan Commission's decision to permit removal of the existing structures. The Plan Commission claims that if Bodenhafer was on the witness stand this court would allow him to explain the policy reasons for the Plan Commission's findings. The Plan Commission's findings, attached as Exhibit C to the Bodenhafer Affidavit, state:

Lots numbered three through five ("Lots") in the Broadmoor Addition ("Plat"), in the 8800 block of Lima Road, on the west side of Lima Road, are the subject of a pending Rezoning Petition and Application for Primary Development approval filed by the Petitioners for this vacation. The Petitioners' request that the Lots and the Restrictive Covenants ("Covenants") recorded in the PlatBook 15, page 96, as amended by the Miscellaneous Record 105, page 82, as applied only to the Lots, be vacated in order to facilitate the development of the Lots.

The conditions relating to the Lots, given that Lima Road has become a major commercial and transportation corridor, have changed so as to defeat the original purpose of the Plat, and the Covenants which were originally platted and restricted to single-family residential uses. Furthermore, the public interest would be promoted by vacating the Lots and the Covenants so that the subject property may develop into commercial uses which will serve as a buffer between Lima Road and the remaining single-family residential lots in Broadmoor Addition. Also, the value of the remaining land in the Plat not owned by the Petitioners will not be diminished by

the vacation of the Lots and the Covenants, but their value may actually be enhanced through this development as it will cause the removal of some run-down residential structures should the commercial developments of the Lots be permitted to proceed. Copies of the Plat and Covenants are attached collectively as Exhibit "B–1".

Furthermore, this vacation would not hinder the growth or orderly development of the neighborhood to which it is contiguous in that the Lots are adjacent to single-family lots which do not front on Lima Road, and thus are more conducive to residential uses. This vacation will not make access to other lots within the Broadmoor Addition more difficult in that the Petitioners do not seek to vacate a public way. The proposed vacation likewise will not hinder the access of the public to a church, school or other public building or place. Finally, the vacation will not hinder the use of a public way by the neighborhood which it is contiguous to the Lots.

This court agrees with the Daniels that the seven reasons Bodenhafer gives as to why the Plan Commission decided it was in the best interest of the public to vacate the restrictive covenants are merely conclusory self-serving statements made after the Plan Commission issued its findings. The Commission's written findings speak for themselves and cannot now be contradicted or changed by the testimony of a member of the Plan Commission. Consequently, paragraph 12 will be stricken.

■ In paragraph 13 of his affidavit, Bodenhafer states that he and the other members of the Plan Commission satisfied all of the statutory standards set forth by Indiana Code § 36–7–3–11(e). The Daniels argue that whether the statutory standards were satisfied is a legal conclusion that Bodenhafer is not able or authorized to make. Clearly, the Daniels are correct.

8. The Plan Commission's three-page brief in support of its motion for summary judgment relies exclusively on Bodenhafer's affidavit.

While Bodenhafer may testify to the effect that he, as President of the Plan Commission, intended to satisfy the requirements of applicable law, whether he actually did so is a legal conclusion to which Bodenhafer may not testify. Therefore, paragraph 13 will be stricken.

■ In paragraph 15 of his affidavit, Bodenhafer states that the photographs attached to his affidavit as Exhibit B show "three uninhabited deteriorating residential structures." The Daniels argue that this statement is an inadmissible conclusory opinion. The Plan Commission argues that the evidence does show that there were uninhabited deteriorating residential structures on the lots and that the application for vacation also stated that there are "some run down residential structures." However, as the Daniels point out, any reliance by Bodenhafer on the application is prohibited by the hearsay rules. Further, any statement as to the condition of the structures shown in photographs is a statement based upon Bodenhafer's opinion of what the photographs show. Thus, paragraph 15 will also be stricken.

■ The court will now turn to the motions for summary judgment. The Plan Commission asserts that it is entitled to summary judgment because, it claims, the undisputed fact is that the restrictive covenants on the real estate were vacated in the public interest[8]. Indiana Code § 36–7–3–11(e) provides, in pertinent part, as follows:

The plan commission shall approve the petition for vacation of all or part of a plat only upon a determination that:

1. conditions in the platted area have changed so as to defeat the original purpose of the plat;

2. it is in the public interest to vacate all or part of the plat; and

' To the extent that the Bodenhafer Affidavit has been stricken the Plan Commission's arguments likewise fail.

3. the value of that part of the land in the plat not owned by the petitioner will not be diminished by vacation.

The Plan Commission argues that it made its determination on January 20, 2000, that all three of the statutory tests were met and, therefore, it is entitled to summary judgment. The Daniels, however, in their motion for summary judgment, argue that Indiana Code § 36–7–3–11 unconstitutionally authorizes private takings.

The Indiana Supreme Court found that Indiana Code § 36–7–3–11, prior to its amendments in 1981 and 1986, was unconstitutional both because it authorized the vacation of restrictive covenants for private purposes and because it failed to provide procedures to assure just compensation was paid in the event of a public taking. *Pulos v. James,* 261 Ind. 279, 302 N.E.2d 768, 770–71 (1973). In *Pulos,* a plan commission vacated the plaintiff's restrictive covenants pursuant to the pre-amendment version of Indiana Code § 36–7–3–11(b). The plaintiff, Pulos, owned property in a plat encumbered by a restrictive covenant that required only residential buildings be erected on land within the plat. *Id.* at 770. The defendants believed that their lots were more valuable for commercial rather than residential use. *Id.* at 771. The defendants petitioned the planning commission of Marion County, Indiana, which vacated the restrictive covenants. *Id.*

The *Pulos* court first noted that a restrictive covenant in a plat is a covenant running with the land, and that a state that takes a restrictive covenant for a private purpose violates both the Federal and Indiana Constitutions. *Id.* at 772. Because the exact issue raised by the case was one of first impression in Indiana, the Indiana Supreme Court relied upon Massachusetts law in determining whether the statute unconstitutionally authorized private takings. In analyzing a statute similar to the one in *Pulos,* the Massachusetts Supreme Court stated, "Each of the respondents is to be forced against his will to surrender his right in the nature of an easement in the land of another when it is not 'inoperative, illegal or void' according to the decision of the land court. He will be obligated to make surrender of this real estate right and accept money damages in place of it, not because demanded by the public interests, but because a neighbor desires it for his private aims." *Id.* at 773 (quoting *Riverbank Improvement Co. v. Chadwick,* 228 Mass. 242, 117 N.E. 244 (1917)). The *Pulos* court also cited with approval the Massachusetts' court's statement that "[i]f the statute is merely for the benefit of individual property owners, the purpose does not justify the taking of a right in the land against the will of the owner." *Id.* at 774 (citations omitted).

The *Pulos* court determined that the Indiana statute authorized a plan commission to take an individual's property rights, restrictive covenants, for the sole use and benefit of the defendants. *Id.* at 774. The court concluded that the statute "violates both the Indiana and United States Constitutions...." *Id.* The Indiana Supreme Court also found that, even if the statute authorized plan commissions to act only for the public good and not to benefit private individuals, the statute would remain unconstitutional because no provision was made to compensate the owners of other lots within the plat. *Id.*

The Indiana legislature amended Indiana Code § 36–7–3–11 in 1981 and 1986. These amendments added, *inter alia,* subsection (e) to the statute. This subsection, which is quoted earlier in this order, added a requirement that a plan commission determine that vacating the restrictive covenant is in the "public interest", presumably a legislative attempt to cure the statute that *Pulos* found unconstitutional. The Daniels argue that the amendments to the statute fail to cure its constitutional defects.

The Daniels contend that the Indiana legislature has not declared what purposes are "public" so as to justify the vacation of restrictive covenants pursuant to Indiana

Code § 36–7–3–11. According to the Daniels, no legislative purpose for the statute is apparent from its provisions. In broadly construing the "public use" requirement of the Fifth Amendment's takings clause, the United States Supreme Court has relied primarily, if not exclusively, upon legislative determinations of "public purposes" within the statutes authorizing the takings. *See e.g., Hawaii Housing, Auth. v. Midkiff,* 467 U.S. 229, 239–42, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984).

The Daniels argue that constitutionally valid eminent domain statutes are based upon a legislative declaration of the purposes for which private property may be taken. For example, the Indiana legislature has granted public utilities the eminent domain power pursuant to Indiana Code § 8–1–8–1. In Indiana Code § 8–1–8–1, the legislature has declared what purposes are "public" and therefore justify the public utilities' use of eminent domain. The legislature has concluded that a public utility may condemn land for its "building, structures, dams, line of poles, wires, mains, conduits, pipelines, or right of way to accommodate railway siding or switch tracks ... overflowage by back-water from its dams, wastes, or sluice-waste" if doing so is necessary to the carrying out of the public utilities' "objects". That same provision provides that a public utilities' "objects" are the production, transmission, delivery, or furnishing of heat, light, water or for the collection, treatment, purification, and disposal in a sanitary manner of liquid and solid sewage or furnishing facilities for transmission of intelligence by electricity to towns and cities and to the public in general or for the furnishing of elevator or warehouse service, either directly or indirectly, to or for the public. *Id.* Clearly, public utilities are constrained to exercise their power of eminent domain only for certain legislatively defined public purposes.

The Daniels argue that Indiana Code § 36–7–3–11 does not provide any purpose that the legislature has deemed to be "public" so as to justify the vacation of restrictive covenants. Rather, the legislature left the determination as to what was in the "public interest" to the individual plan commissions, which are entities of the executive-branch of Indiana's government. Thus, the Daniels contend that the typical deference given to a legislative determination as to what use is "public" is inappropriate in this case.

The Daniels further argue that the procedures authorized by Indiana Code § 36–7–3–11 show that the statute authorizes private takings. Under the statute, a private individual requests that a plan commission take restrictive covenants from other private individuals solely for the petitioner's benefit. The Daniels assert that the petitioner does not have, nor should he have, any motive to make this request other than for his sole benefit. The plan commission, without any legislative guidance, must determine if the petitioner's request advances the "public interest". The Daniels argue that if the plan commission wants to approve the petition, it must do no more than make conclusory, written findings that the vacation of the covenants is "in the public interest." *See* Ind.Code § 36–7–3–11(f).

The Daniels have taken the position that this procedure is the exact opposite of the procedure authorized by valid eminent domain statutes. For example, Indiana Code § 8–1–8–1 provides that public utilities, not individual property owners, make a determination that condemnation of a particular piece of property is necessary. Then, once a public need has been established, the public utility must find that the condemnation serves a legislatively defined public use. The determination of "public use" occurs only after the use of eminent domain has been found to be necessary. In contrast, argue the Daniels, Indiana Code § 3–6–7–3–11 allows private individuals to initiate condemnation proceedings for their sole benefit, while the planning commission makes an after-the-fact determination as to whether the requested vacation is in the

public interest on an ad hoc basis, without being required to determine if the vacation is even needed.

The Daniels argue that the Indiana courts have found the exact procedures set forth by Indiana Code § 36-7-3-11 to be unconstitutional. In *Indiana v. Smith*, a business owner attempted, without success, to purchase three lots surrounding his business. 178 Ind.App. 1, 381 N.E.2d 873, 874-75 (1978). Without owning one of these lots, the business owner could not continue to have trucks deliver freight to his building in the same manner to which he was accustomed. *Id.* at 875. The business owner requested that the Highway Commission condemn one lot so that he could continue to receive freight in his customary manner. *Id.* Shortly thereafter, the Highway Commission instituted condemnation proceedings. *Id.* The condemnation was challenged as a "private taking". *Id.*

In *Smith*, the State maintained that the taking was for a "public use" because the business owner was "land locked" because the Highway Commission constructed a highway near the business. *Id.* at 875-76. The court rejected this as an after-the-fact justification, holding that the lot condemnation was clearly for a private use because it was not until the business owner talked with the Indiana State Highway Commission that consideration was given to the condemnation. *Id.* at 876. Further, the property dimensions were based upon the turning radius of the semi-tractor truck that customarily delivered freight to the business owner. *Id.* at 876. The court stated that "the State must not capriciously resort to the power of eminent domain when other suitable and perhaps less expensive alternatives are available. To contend otherwise is to repudiate our time honored concept of private property and the paramount value we place upon it." *Id.*

The Daniels argue that like the State Highway Commission in *Smith*, plan commissions are given the authority to exercise their powers of eminent domain at an individual's request. Plan commissions need not have even considered removing restrictive covenants in the area subject to a petition prior to receiving the petition. Rather, Indiana Code § 36-7-3-11 allows plan commissions to make an after-the-fact determination that a particular use is "public" and thus justifies the taking of private property. Thus, argue the Daniels, while Indiana Code § 36-7-3-11 essentially grants a plan commission powers of eminent domain, it does not require that Indiana's eminent domain procedures be followed.

Indiana's eminent domain statute, Indiana Code § 32-11-1-11, provides that any person, corporation, or other body having the right to exercise the power of eminent domain for any public use under any statute must do so "only in the manner provided in this chapter unless otherwise provided." The Daniels point out that all of Indiana's constitutional eminent domain statutes require compliance with the procedures of the Indiana eminent domain statute. *See e.g.*, Indiana Code § 8-1-8-1 (providing that "appropriation and condemnation of lands and easements in lands authorized by this section shall be had and done in all respects under and pursuant to the terms and conditions and in the manner prescribed by IC 32-11-1"). The Daniels contend that by not requiring compliance with Indiana's eminent domain statute, Indiana Code § 36-7-3-11 allows Indiana's executive branch to make an end run around Indiana's eminent domain statute to take private property for whatever purpose a plan commission deems to be in the public interest.

The Daniels stress that the Plan Commission's position with respect to the pending motions illustrates the unconstitutional nature of Indiana Code § 36-7-3-11. That is, the Plan Commission has taken the position that since it could only vacate restrictive covenants for a public use, its vacation of the restrictive covenants must have been in the public interest. Essen-

tially, the Plan Commission is stating that it vacated the restrictive covenants in the public interest because it said it vacated the restricted covenants in the public interest. According to the Daniels, this position shows that Indiana Code § 36–7–3–11 authorizes a plan commission to take restrictive covenants belonging to private individuals for any reason as long as the plan commission states that the taking was in the public interest. The Daniels strongly contend that the constitution requires much more than provided by Indiana Code § 3–6–7–3–11 before a state is allowed to take private property.

Continuing with their arguments, the Daniels contend that, unlike constitutionally valid eminent domain statutes, Indiana Code § 36–7–3–11 does not assure that the public interest is served by a taking of private property. When a public utility exercises its eminent domain powers pursuant to Indiana Code § 8–1–8–1, for example, to install electrical wires, the electrical wires are actually installed upon the taken property. This does not always occur when property is taken pursuant to Indiana Code § 36–7–3–11.

In fact, HNS informed the Plan Commission that it intended to build a 12,000 square foot shopping center, which consisted of five stores all within a single story building, on Lots 3–5 of Broadmoor Addition. However, after the restrictive covenants were vacated and the property was rezoned, HNS decided to sell the property. HNS is now advertising the property as zoned C–2A and asking for $695,000 in exchange for the property.

Section 3–6–13–2 of the Allen County Zoning Ordinance provides the uses to which land that is zoned C–2A may be put. A neighborhood shopping center may be built on such property, but it must have "the sole intent of serving the surrounding residential neighborhoods by providing goods and services that meet day-to-day needs." Owners of areas that are zoned C–2A may also use the property for most C–1A and C–1 uses. These uses include a service station, a tire store, a car wash, a laundromat, a tavern, a package liquor store, a massage salon, a bowling alley, a pool hall, billboards, and manufactured or mobile homes.

As the Daniels point out, if the Plan Commission's decision to vacate the restrictive covenants is upheld, after HNS sells the property, the new owners may use the property for a tavern, a pool hall, a massage salon, a car wash, and a package liquor store. Thus, it is clear that once the restrictive covenants are gone, the property may be put to a use totally different from what the Plan Commission found to be in the public interest. According to the Daniels, this shows that the statute is unconstitutional.

The Plan Commission, however, argues that Indiana Code § 36–7–3–11 is constitutional. The Plan Commission claims that the Indiana legislature has, in the enactment of Indiana Code 36–7–3–11(e), specifically provided concrete guidance to the administrative agencies in their determination of whether parts of plats or covenants may be vacated. As discussed earlier, § 36–7–3–11(e) provides:

> The plan commission shall approve the petition for vacation of all or part of a plat only upon a determination that:
>
> 1. conditions in the platted area have changed so as to defeat the original purpose of the plat;
>
> 2. it is in the public interest to vacate all or part of the plat; and
>
> 3. the value of that part of the land in the plat not owned by the petitioner will not be diminished by vacation.

The Plan Commission claims that the Indiana legislature has spelled out in limited instances why and when covenants can be vacated, and therefore Indiana Code 36–7–3–11 is constitutional.

The Daniels, in response, argue that the three "determinations" set forth by Indiana Code § 36–7–3–11(e) are not legislative declarations regarding public purposes that justify a taking of private prop-

erty. The Daniels point out that only one of the determinations even mentions a "public interest" and that determination provides that the plan commission must find that it is in the "public interest" to vacate a restrictive covenant. However, a plan commission may determine what purposes are in the public interest by applying any standards that it feels may be necessary to make that determination. The resulting situation is that the legislature has declared that any purpose is a public purpose, so long as a plan commission says so. The Daniels maintain that this is not the legislative declaration required by the United States Constitution before private property may be taken. *See Vaselopulos v. Group W Cable*, No. 85C3202, 1986 WL 8769, at \*\*2–4, 1986 U.S.Dist. LEXIS 22002, at \*7–11 (N.D.Ill. July 31, 1986).

Finally, the Daniels argue that the statute is also unconstitutional because it fails to provide just compensation for the taking. In *Pulos*, the Indiana Supreme Court held that the statute unconstitutionally failed to provide for compensation even if takings under the statute were for a public use. 302 N.E.2d at 774. The Plan Commission has asserted that the Daniels have a remedy for compensation pursuant to Indiana's inverse condemnation statute, Indiana Code § 32–11–1–12. This statute provides:

> Any person having an interest in any land which has been or may be taken for any public use without having first being appropriated under this or any prior law may proceed to have its damages assessed under this chapter, substantially in the manner herein provided.

The Daniels claim that the Commission's reliance on this statute is misplaced for two reasons. First, the Daniels claim that their property has been taken for a private, rather than public, use. Second, the Plan Commission has already made a finding that "the value of the part of the land in the plat not owned by the petitioner will not be diminished by vacation." As the purpose of an inverse condemnation action

is to receive damages as a result of a reduction in property value caused by a governmental taking, it would be inconsistent for the Plan Commission to approve the petition for vacation of the restrictive covenants, and at the same time assert that the Daniels cannot prevail in this action because they may seek to have "damages" paid pursuant to the inverse condemnation statute.

The Daniels maintain that the issues in this case have been addressed by the District Court for the Northern District of Illinois. In *Vaselopulos v. Group W Cable*, No. 85C3202, 1986 WL 8769, 1986 U.S.Dist. LEXIS 22002 (N.D.Ill. July 31, 1986), the court addressed the constitutionality of an Illinois statute that conferred eminent domain powers upon cable television franchisees. That statute provided that a property owner could not prevent any tenant from receiving cable television service from a franchisee and could not prevent the franchisee from entering upon his property for the purpose of providing such service. *Id.* at 1986 WL 8769, at \*1, 1986 U.S.Dist. LEXIS 22002 at \*2. The franchisees were given the right to possess an easement over any tenant-inhabited property for the installation of cable television services. *Id.* at \*1, 1986 U.S.Dist. LEXIS 22002 at \*2–3.

In *Vaselopulos*, the owner of an apartment building in Chicago challenged the constitutionality of this statute. *Id.* The district court vacated its initial denial of the franchisee's motion to dismiss to allow a state court to determine the question of constitutionality of the statute. The Illinois state court thereafter determined that the statute was unconstitutionally volatile of the eminent domain and due process provisions of the Illinois Constitution because it failed to provide an acceptable compensation procedure and because the statute was not supported by a legislative declaration that the use of eminent domain was for a determinable public use. *Id.* at \*2–3, 1986 U.S.Dist. LEXIS 22002 at\*5–6.

In once again denying the franchisee's motion to dismiss, the district court noted that although the United States Supreme Court has stated that a court may not substitute its judgment for a legislature's judgment as to what constitutes a public use unless the use is without a reasonable foundation, the Illinois legislature had not spoken as to whether installation of cable television was a public use. *Id.* at *3–4, 1986 U.S.Dist. LEXIS 22002 at *9–10. Although the Illinois statute was silent as to the question of whether the installation of cable television was a public use, the courts of Illinois had taken a view that it was not a public use. *Id.* The district court noted that the parties had not presented any evidence as to a determination by the Illinois legislature that the taking of private property for the installation of cable television is a public use, and held that:

> [I]t would be inconsistent with the principle of federalism for this Court itself to declare that the taking under the Access Statute serves a public purpose or public use. It would be performing the function that the people of Illinois have a right to expect their own elected state representatives to perform. This is particularly true where, as here, the Illinois legislature has enacted a law that on its face ignores, if not eliminates, the fundamental and historical exclusive right of property owners in this State to profit from a lawful use of their own private property. In such a case, a public use should not have to be presumed or inferred.

*Id.* at *3–4, 1986 U.S.Dist. LEXIS 22002 at *10–11.

The Daniels argue that Indiana Code § 36–7–3–11 presents the same constitutional issues as presented by the Illinois cable television franchisee statute because the Indiana legislature has not spoken as to what uses are "public" so as to justify the removal of restrictive covenants. The Daniels point out that the Indiana courts have taken the view that restrictive covenants may not be taken to allow an individual to develop residential property for commercial uses. *Pulos,* 302 N.E.2d at 774. The Daniels assert that, at the very least, it would be inconsistent with the principles of federalism for this court to declare that the Plan Commission took the Daniels' covenants for a public use or in the public interest absent such a declaration by the Indiana legislature.

After careful consideration of all the parties' arguments, this court concludes that the Plan Commission, pursuant to Indiana Code § 36–7–11, took the Daniels' property for private use. In *Pulos,* the Indiana Supreme Court found that the planning commission took and destroyed the restrictive covenants "for the sole use and benefit of the defendants, *i.e.,* their use of their lots in Meadowview for business rather than residential purposes." *Id.* It is clear that the amendments to Indiana Code § 36–7–3–11 do not change the fact that the Plan Commission removed the Daniels' restrictive covenants to allow HNS to commercially develop its lots, which is a purely private purpose. The fact that the Plan Commission made a "determination" that the vacation of the covenants was in the "public interest" does not make the statute constitutional. The Indiana legislature has not spoken to what constitutes a public use sufficient to vacate restrictive covenants. Thus, the Plan Commission, as an executive branch organization, is granted the authority to "determine" that any purpose is in the public interest and vacate any restrictive covenant pursuant to the statute. Moreover, the statute does not even require that the Plan Commission follow the procedures set forth by Indiana's eminent domain statute. Therefore, the Plan Commission's taking of restrictive covenants to allow another individual to commercially develop property is a purely private taking, and unconstitutional. This court finds that Indiana Code § 36–7–3–11 is unconstitutional and that the Plan Commission has violated 42 U.S.C. § 1983 by depriving the Daniels of

a constitutionally protected right under the color of state law.

■ In response to the Daniels' motion for summary judgment, the Plan Commission also argues that this court need not decide the constitutionality of Indiana Code 36–7–3–11. For the reasons that follow, the court rejects the Plan Commission's argument. The Plan Commission claims that the original envisioned purpose of the covenants (preserving the residential nature of the neighborhood) can no longer be attained and, therefore, the covenants are unenforceable. The Plan Commission claims that the area surrounding Broadmoor Addition has changed so as to make the covenant unenforceable. The Plan Commission cites increased traffic and commercial development as changes to the area surrounding Broadmoor Addition. The Plan Commission has cited several cases which it claims supports its position that the restrictive covenant at issue is no longer enforceable. However, a review of these cases reveal that they do not support the Plan Commission's position.

In *Corner v. Mills,* 650 N.E.2d 712, 716 (Ind.Ct.App.1995), the Indiana Court of Appeals addressed a claim that a residential restrictive covenant within a subdivision was unenforceable because there had been "significant commercial development" along a road that was adjacent to the subdivision. The plaintiff, a landowner within the subdivision, argued that this commercialization made the continued residential nature of the subdivision no longer feasible. *Id.* The appellate court reversed the trial court's finding in the plaintiff's favor, stating that "[i]t is only where the use of the property and the surrounding area has so radically changed from what was originally envisioned making the covenants no longer sustainable, that they will be lifted as unenforceable." *Id.* at 716–17. (citation omitted). The court found that the plaintiff's unilateral speculation that his properties were worth more if developed commercially was insufficient to nullify the otherwise valid residential cove-

nant. *Id.* The court also found that the residential integrity of the land subject to the restrictive covenants had remained unchanged for almost fifty years, with nothing but single family homes having occupied the land during that time. *Id.* The court concluded that the record did not support the contention that it was no longer practical to maintain the land as a residential neighborhood. *Id.* at 717.

In *Hrisonalos v. Smith,* the Indiana Court of Appeals again addressed a claim that extensive commercialization, including a substantial increase in traffic and the use of lots within the subdivision for a church and chiropractic office, rendered the residential restrictive covenant unenforceable. 600 N.E.2d 1363, 1365–67 (Ind.App.1992). The plaintiff, a landowner within the plat, wanted to maintain a dentist's office on his lot. *Id.* at 1365. The Indiana Court of Appeals found the trial court's decision in the plaintiff's favor to be clearly erroneous. *Id.* at 1365–67, 1369.

The *Hrisonalos* court held that a court must consider two types of changes when deciding whether restrictive covenants are enforceable: changes within the area subject to the restrictive covenants, and changes outside of that area. *Id.* at 1367. The court found that less weight should be given to changes occurring outside of the covered area than to changes occurring inside that area. *Id.* The court also found that the burden of showing that enforcement of a covenant violates public policy is not satisfied "merely by proving that particular changes have occurred; rather, it also requires the party to show how the changes had adversely affected the purpose of the covenant." *Id.* The appellate court found that the heavy commercialization and increase in traffic did not threaten the purpose of the covenant, and that the homeowners within the subdivision maintained their residential way of life despite the church and chiropractic office within that area. *Id.* Accordingly, the residential restrictive covenant was enforceable. *Id.*

In *Burnett v. Heckelman,* 456 N.E.2d 1094, 1098 (Ind.Ct.App.1983), the Indiana Court of Appeals again found as a matter of law that commercialization and increased traffic near property subject to a residential restrictive covenant did not render the covenant unenforceable. The court rejected the plaintiff's claim that a diminution in the value of property was sufficient to declare the restrictive covenants unenforceable, additionally noting that there was no evidence that the diminution in value altered the "residential nature of life *within*" the subdivision or made continued enforcement of the covenants meaningless. *Id.* at 1099 (citation omitted) (emphasis in original). The *Burnett* court noted that "[t]here is always a line or point where commercial and residential districts must join." *Id.* (citation omitted).

In *Cunningham v. Hiles,* 182 Ind.App. 511, 395 N.E.2d 851 (1979), the Indiana Court of Appeals again held that increased traffic that was restricted to the perimeter of one corner of a subdivision subject to a residential restrictive covenant did not justify invalidation of the restrictive covenants. *Id.* at 856. The court so held even though the traffic had increased approximately eight to ten times over the period from the recording of the restrictive covenants until the case was filed. *Id.* at 855.

In *Bob Layne Contractor, Inc. v. Buennagel,* 158 Ind.App. 43, 301 N.E.2d 671 (1973), the court found that restrictive covenants would not be affected by a petition to a court requesting that lots be vacated from a plat. *Id.* at 678. The court noted that restrictive covenants should be enforced even if the land to which they are subject is vacated from the plat or is rezoned. *Id.*

The Daniels argue that each of the cases cited by the Plan Commission holds as a matter of law that commercial development and increased traffic do not render a restrictive covenant unenforceable. The Daniels point out that the only reasons given by the Plan Commission as to why the residential restrictive covenants applicable to Broadmoor Addition should be found to be unenforceable are commercial development and increased traffic in the area *near* Broadmoor Addition. The Daniels argue that because these changes have occurred outside of Broadmoor Addition they must be given less weight than any changes within the addition.

The Daniels further argue that for the residential restrictive covenant to be unenforceable, it must be shown that the changes are so radical that they clearly defeat the purpose of the covenant. The Daniels contend that the residential nature of life in Broadmoor Addition has not been interrupted by any of the changes cited by the Plan Commission. In fact, numerous residents of Broadmoor Addition appeared at the hearing at which the Plan Commission discussed vacation of the restrictive covenant and objected to the use of lots 3–5 for commercial purposes. No one other than the owners of lots 3–5 were in favor of vacating the covenant. The Daniels point out that, as the *Burnett* court noted, there is always a line where commercial and residential areas will join, but that fact does not make residential restrictive covenants unenforceable.

The Daniels also argue that even if the changes outside of Broadmoor Addition were radical enough to cause the residential covenant to be unenforceable, the Plan Commission does not explain how it has standing to make such a claim. A restrictive covenant is a contract between all of the landowners within a plat. *Pulos v. James,* 261 Ind. 279, 302 N.E.2d 768 (1973). The Daniels point out that every case cited by the Plan Commission was initiated by the landowner within a plat subject to the restrictive covenant, not by a plan commission. The Daniels argue that because the Plan Commission is not a party to the restrictive covenant and, therefore, lacks standing to assert that the covenant is unenforceable.

The Daniels further argue that the Plan Commission's position that the Broadmoor Addition residential restrictive covenant is unenforceable is belied by its own actions. The Daniels claim that if the covenant were truly unenforceable, the landowners would not have needed to request that it be vacated, and the Plan Commission would not have needed to vacate it. Yet, both the landowners and the Commission believed that the covenant must be vacated to allow the landowners to put the property to a use other than single family housing. This court finds the Daniels' arguments on this point to be well taken and further finds that the Plan Commission has failed to show that the restrictive covenant is unenforceable.

In what appears to be a last-ditch effort, the Plan Commission argues that, in any event, the "single family dwelling" restriction does not apply to the real estate in question. The Plan Commission refers to the Amended Restrictions (applicable to the Broadmoor Addition), which are set out in the Daniels' Exhibit 2. The pertinent restriction reads:

A. All lots in the tract shall be known and described as residential lots, except Lot No. 1 which may be used for retail business.

No structure shall be erected, altered, placed or permitted to remain in any residential building plot other than one detached single family dwelling not to exceed two and one half stories in height and a private garage for not more than 2 cars.

The Plan Commission argues that Lots 3–5 are not residential building plots because the real estate is zoned C–2A (commercial). The Plan Commission argues that the quoted language above shows that the single family dwelling covenant only applies to residential building plots and not to all real estate.

As the Daniels point out, the Plan Commission's argument is clearly wrong. The plat of Broadmoor Addition defines all lots as residential (except Lot No. 1). There-fore, the Plan Commission has no basis on which to claim that Lots 3–5 are not residential lots. Additionally, contrary to the Plan Commission's argument, the vacation of a lot from a plat subject to restrictive covenants has no effect on the enforceability of those restrictive covenants. *See Bob Layne*, 301 N.E.2d at 678 ("Neither expressly or impliedly is there an inkling that restrictive covenants accompanying the lots or blocks are extinguished."). This court agrees with the Daniels that the residential restrictive covenant taken from the Daniels is an enforceable contractual right owned by the Daniels and all other homeowners within Broadmoor Addition, and that that right has not been dissolved because of the rezoning or vacation of Lots 3–5 in Broadmoor Addition. *See Bob Layne*, 301 N.E.2d at 678 ("Both text writers and case law agree that rezoning of an area burdened by restrictive covenants will not alone relieve that area from valid private restrictive covenants.").

*Conclusion*

On the basis of the foregoing, the Daniels' motion to strike portions of the Bodenhafer Affidavit is hereby GRANTED. Further, the Daniels' motion for summary judgment is hereby GRANTED and the Plan Commission's motion for summary judgment is hereby DENIED.

The Court hereby enters a DECLARATORY JUDGMENT finding that the Plan Commission has committed a violation of § 1983 and has violated the United States and Indiana Constitutional rights of the Daniels by removing the restrictive covenants from lots 305 of the Broadmoor Addition.

The Court hereby enters a DECLARATORY JUDGMENT that the restrictive covenant running with the land limiting the use of lots 3–5 of the Broadmoor addition to single family residences remains in full force and effect and that the acts of the plan Commission purporting to vacate the restrictive covenant is void.

The Court hereby enters a PERMANENT INJUNCTION ordering the Plan Commission to reverse the approval of the HNS/LST petition and prohibiting the Plan Commission from removing the restrictive covenants contained in the plat of Broadmoor Addition for any private purpose.