In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-1158

WILLIAM DANIELS AND JUDY DANIELS,

*Plaintiffs-Appellees,*

v.

THE AREA PLAN COMMISSION OF ALLEN COUNTY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 00 C 157—**William C. Lee**, *Chief Judge.*

ARGUED NOVEMBER 1, 2001—DECIDED SEPTEMBER 11, 2002

Before FLAUM, *Chief Judge*, MANION and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.*

## I.

On April 13, 2000, William and Judy Daniels filed a complaint, under 42 U.S.C. § 1983, in the United States District Court for the Northern District of Indiana, seeking a declaratory judgment that the Area Plan Commission of Allen County violated the Fifth and Fourteenth Amendments to the U.S. Constitution, as well the Indiana Constitu-

tion, when it vacated a restrictive covenant attached to their property that was designed to preserve the residential character of the surrounding neighborhood. On cross-motions for summary judgment, the district court concluded that the Plan Commission violated the Daniels' Fifth Amendment right by vacating the restrictive covenant without a public purpose. The court entered a permanent injunction ordering the Plan Commission to reverse its removal of the covenant and prohibiting the Plan Commission from further removal of the covenants for any private purpose. The court also found that Indiana Code § 36-7-3-11, under which the Plan Commission had vacated the covenant, was unconstitutional because it does not require the Commission to follow the procedures set forth in the state's eminent domain statute for determining public use. We affirm in part and reverse in part.

## II.

William and Judy Daniels ("the Daniels") are the current owners and residents of the property located at 1735 Broadmoor Avenue in Fort Wayne, Indiana. The Daniels' property is in a subdivision commonly known as the Broadmoor Addition ("Broadmoor"). Broadmoor was surveyed and platted for 80 lots in 1940 and the Daniels own lot 10. The plat of the Broadmoor Addition has had a restrictive covenant limiting lots to residential use since the subdivision was platted. Specifically, the plat's restrictive covenant states: "No building other than a single family dwelling and a private garage shall be built on any one lot."

The Broadmoor lots numbered three through five (collectively referred to as "Lots"), located in the 8800 block on the west side of Lima Road, are the subject of the current litigation. Along with lots one and two, these prop-

erties form the eastern perimeter of Broadmoor along Lima Road. Lima Road is a north-south corridor into Fort Wayne, Indiana, where each day over thirty thousand cars travel. In October 1999, HNS Enterprises, LLC and LST, LLC (collectively "HNS"), as the owners of the Lots, submitted a rezoning petition and application for primary development to the Area Plan Commission of Allen County ("Plan Commission"). As part of the application, HNS requested that the Plan Commission vacate their Lots and the associated restrictive covenants from the Broadmoor plat pursuant to Indiana Code § 36-7-3-11.[1] HNS also petitioned the Commission to rezone the Lots to C-2A/Neighborhood Shopping Center and approve a primary development plan for the Lots consisting of a 12,000 square foot shopping center which contained five stores within a single story building (the "Broadmoor Shops"). At the time, each of the Lots contained an uninhabited residence.

On December 9, 1999, the Plan Commission held a public hearing on the petitions and numerous residents of Broadmoor objected to the granting of any of HNS' petitions. Also at the hearing, the Daniels' counsel appeared and argued that the Plan Commission did not have the authority to remove the restrictive covenants requiring that all structures built within Broadmoor be single-family residential homes. The Daniels' counsel further argued that the vacation and rezoning of lots three through five of Broadmoor would constitute an unconstitutional taking

---

[1] Broadmoor, with the exception of lot 1, was zoned RS-1/Suburban Residential at the time of the petition. Lot 1, located on the corner of the plat on Lima Road, was explicitly exempted from the residential use requirement in the restrictive covenant at the time the subdivision was platted and was instead zoned C-1/Limited Commercial.

of private property for a private use. HNS filed a statement of reasons for the proposed vacation along with its petition to the Plan Commission. In their statement of reasons, HNS claimed that the conditions relating to the Lots had changed so as to defeat the purpose of the plat. HNS also contended that vacating the covenant would be in the public interest because without the residential restriction, HNS could develop the property with commercial uses which would serve as a buffer between Lima Road and the remaining residences. Finally, HNS claimed that the covenant vacation would not diminish the value of the remaining single-family homes in the plat and could in fact increase their value due to the run-down nature of the uninhabited houses currently on the Lots.

At a second meeting held on January 20, 2000, the Plan Commission adopted a "do pass" recommendation approving HNS' rezoning petition. The Plan Commission also granted conditional approval to the vacation of the Lots from the plat of the Broadmoor Addition and for the primary development plan for the Broadmoor Shops. The Plan Commission specifically found that it was in the public interest to vacate the Lots and covenants from the Broadmoor plat because:

> it would allow the site to be redeveloped with commercial uses which could be a more appropriate use for the property and could be a benefit to the immediate neighborhood. The uninhabited and deteriorating residential structures would be removed from the site.

In addition the Plan Commission found that the value of the other lots in Broadmoor would not be diminished by the vacation because:

> redevelopment of the site for commercial uses will require development plan review by the plan commis-

sion. This review will address land use compatibility issues resulting from commercial use of the property, and will preserve property values in the remainder of the subdivision. The uninhabited and deteriorating residential structures would be removed from the site.

The Plan Commission also imposed several conditions designed to limit the impact of the development of the "Broadmoor Shops" on Broadmoor's residential character. The conditions impose frontage, transportation and state agency approval requirements. The Plan Commission apparently also added limitations on the future commercial uses of the Lots, although those conditions are not in the record.

On April 13, 2000, before HNS began to develop the Lots,[2] the Daniels filed suit under 42 U.S.C. § 1983 for declaratory relief and a permanent injunction in the United States District Court for the Northern District of Indiana. Under Ind. Code § 36-7-3-11, the Daniels could have challenged the Plan Commission's action in state court by filing of a writ of certiorari to the circuit or superior court of Allen County. *See Ind. Code* § 36-7-4-1016 & § 36-7-4-1004. However, the Daniels did not file the petition to state court and instead proceeded directly to federal court. The Daniels' federal complaint alleged that the Plan Commission's actions violated their constitutional rights by taking the Daniels' property for private use in violation of the Fifth and Fourteenth Amendments of the United States

---

[2] At oral argument, the Plan Commission verified that the Lots are currently listed for sale with a local Ft. Wayne realtor for $695,000. *See also Daniels v. Area Plan Comm'n of Allen County*, 125 F. Supp. 2d 351, 353 (N.D. Ind. 2000).

Constitution and the Indiana Constitution. The Plan Commission filed a motion to dismiss, arguing that the district court lacked subject matter jurisdiction because the Daniels failed to exhaust their administrative remedies and thus their claim was not ripe, or alternatively because the Daniels failed to allege damages. The district court denied the Plan Commission's motion to dismiss, finding that exhaustion of administrative remedies was not required under *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 516 (1982). Both parties then filed motions for summary judgment on the Daniels' claim that the property was taken for private use. In their motion for summary judgment, the Daniels also claimed that Indiana Code § 37-6-3-11 was facially unconstitutional because it permitted takings for private purpose.

The district court granted the Daniels' summary judgment motion. *Daniels v. Area Plan Comm'n of Allen County*, 125 F. Supp. 2d 338 (N.D. Ind. 2000). The court noted that under Indiana common law, "a restrictive covenant in a plat is a covenant running with the land, and that a state that takes a restrictive covenant for a private purpose violates both the Federal and Indiana Constitutions." *Id.* at 348. (citing *Pulos v. James*, 302 N.E.2d 768, 771 (Ind. 1973)). The court concluded that the Plan Commission unconstitutionally took the Daniels' property for private use by removing the restrictive covenants and authorizing another individual to commercially develop property. *Id.* at 353. The court further concluded that because Indiana Code § 36-7-3-11 authorized private takings, it was facially invalid. *Id.* at 353-54. The court issued a declaratory judgment finding that the Plan Commission had committed a violation under § 1983 by depriving the Daniels of their constitutional rights by removing the restrictive covenants from lots 3-5 of Broadmoor. *Id.* The court also entered a declaratory judgment voiding the

acts of the Plan Commission purporting to vacate the restrictive covenant on the Lots, and stating that the covenant remains in full force and effect. *Id.* Finally, the court issued a permanent injunction ordering the Plan Commission to reverse the HNS petition and prohibiting the Plan Commission from removing the restrictive covenants in the plat of Broadmoor for any private purpose. *Id.* at 357. The Plan Commission appeals.

### III.

On appeal the Plan Commission maintains that because the Daniels' claims were not ripe for review the district court erred in concluding that it had subject matter jurisdiction. Additionally, the Plan Commission argues that even if the Daniels' claims were ripe, the district court erred in concluding that its actions constituted a taking for a private purpose. Finally the Plan Commission contends that the statute is not facially unconstitutional.

### A. Subject Matter Jurisdiction

The Plan Commission argues that the district court did not have subject matter jurisdiction over the Daniels' claims. Because the Daniels failed to exhaust their remedies in state court, the Plan Commission asserts that the Daniels' claims are not ripe for review. We review *de novo* a district court's decision that it had subject matter jurisdiction. *CCC Inform. Services, Inc. v. Amer. Salvage Pool Assoc.*, 230 F.3d 342, 345-46 (7th Cir. 2000).

In the recent cases of *Forseth County v. Village of Sussex*, 199 F.3d 363 (7th Cir. 2001), *Covington Court Ltd. v. Village of Oak Brook*, 77 F.3d 177 (7th Cir. 1996), and *Gamble v. Eu Claire County*, 5 F.3d 285 (7th Cir. 1993), we have had

the opportunity to consider the ripeness requirements imposed on litigants by federal courts seeking to challenge takings for private purpose.[3] In each case, we held that the court lacked subject matter jurisdiction because the claim was not ripe for review due to the failure of the plaintiffs to seek state remedies. *See Forseth*, 199 F.3d at 370, *Covington Court*, 77 F.3d at 179, *Gamble*, 5 F.3d at 288. These cases all hinged on the ripeness hurdles imposed on Takings Clause litigants by the Supreme Court in *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). In light of our past jurisprudence, we begin our analysis with *Williamson County.*

In *Williamson County*, the Supreme Court held that prior to initiating a civil action for a taking in federal court, a plaintiff must demonstrate that he has both received a "final decision regarding the application of the [challenged] regulations to the property at issue" from "the government entity charged with implementing the regulations," *id.* at 186, and has sought "compensation through the procedures the State has provided for doing so." *Id.* at 194. The Plan Commission argues that because the Daniels did not seek state remedies for the alleged taking, their claim is barred under *Williamson County.*

In this case the Daniels did not seek redress in state court for either equitable relief or compensation after the

---

[3] In *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 733 n. 7, the court noted that ripeness requirements stem from both Article III as well as "prudential reasons for refusing to exercise jurisdiction." (*citing Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57, n. 18 (1993)). The Court describes the requirements imposed specifically on federal Takings Clause claimants as "prudential". *Id.* at 734.

Plan Commission issued its decision on the plat vacation. They claim that they bypassed state court first because they were not seeking monetary compensation, which is the only remedy available through the state's inverse condemnation procedure, and second, state court relief is not mandated in Takings Clause cases where plaintiffs are only seeking equitable remedies. Instead, the Daniels proceeded to federal court by filing a claim under 42 U.S.C. § 1983. The district court denied the Plan Commission's motion to dismiss for lack of subject matter jurisdiction, relying on *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 516 (1982). In *Patsy*, the Supreme Court held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Id. See also Wudke v. Davel*, 128 F.3d 1057, 1063 (7th Cir. 1997) ("[T]here is no general exhaustion requirement for § 1983 plaintiffs."). The district court reasoned that because the Daniels were litigating a case filed under § 1983, they were not required to pursue state administrative remedies under *Patsy*.

The district court's conclusions are not without foundation as we have commented in the past on the tension between *Patsy* and *Williamson County. See Gamble*, 5 F.3d at 288.[4] In general, *Patsy* does not "require exhaustion of judicial remedies as a precondition to bringing a federal civil rights suit." *Id.* However, the additional ripeness requirements of *Williamson County* create a takings claim exception to *Patsy's* general requirement that exhaustion

---

[4] *See also Samaad v. City of Dallas*, 940 F.2d 925, 937 n. 27 (5th Cir. 1991) (noting that a district court's interpretation of *Williamson County* as imposing an exhaustion requirement in private takings claims was in violation of *Patsy*) (citing *HMK Corp. v. County of Chesterfield*, 616 F. Supp. 667, 670 (E.D. Va. 1985)).

is not required in § 1983 suits. *Id.* at 287. Therefore litigants, like the Daniels in this case, who assert a takings claim under 42 U.S.C. § 1983 may not rely solely on *Patsy*, but must meet the Court imposed ripeness requirements of *Williamson County* prior to bringing a federal claim.[5]

Unlike some circuits, this Circuit has consistently maintained a strict requirement that Takings Clause litigants must first take their claim to state court even when plaintiffs, such as the Daniels, are alleging a taking for private purpose. *See Forseth*, 199 F.3d at 370, *Covington Court*, 77 F.3d at 179, *Gamble*, 5 F.3d at 288. In *Covington Court*, we explicitly stated that even where a state takes property for "a purely private rather than a public use," on "takings and due process claims, [a plaintiff] first must show that it has availed itself of state court remedies." *See Covington Court*, 77 F.3d at 179-80.[6]

---

[5] In determining whether or not the Daniels claim is ripe for review under *Williamson County* it is immaterial whether the Daniels are classifying their federal claim as a Fifth Amendment takings claim or a substantive due process claim under the Fourteenth Amendment. We have chosen to review ripeness concerns in claims for takings for a private purpose under the Fifth Amendment's taking's analysis even if a litigant has claimed that his property was taken in violation of his substantive due process rights. *See, e.g., Forseth*, 199 F.3d at 369, n. 8; *Covington Court*, 77 F.3d at 179 (7th Cir. 1996) (holding that *Williamson County*'s ripeness analysis applies "[r]egardless of the purpose of the taking"); *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 464-66 (7th Cir. 1988) ("[T]he takings clause may be broad enough to take care of the problem without the help of the due process clause."); *see also Gamble*, 5 F.3d at 286-87.

[6] Other circuits have disagreed with this requirement. In *Montgomery v. Carter County, Tennessee*, 226 F.3d 758 (6th Cir. 2000),
(continued...)

<hr>

[6] (...continued)
the Sixth Circuit held that requiring a plaintiff to wait before suing in federal court, "when her sole claim is that she was dispossessed of property for a private use, would have only one apparent purpose—to force the plaintiff to vet her claims in state proceedings (such as a state court declaratory judgment action to quiet title, as the county defendants have suggested) before the claims can be aired in federal court." *Id.* at 770. The court reasoned that forcing the plaintiff to pursue state "remedial" procedures would be an exhaustion requirement, "a requirement that *Williamson County* explicitly does not impose." *Id.* (citing *Williamson County*, 473 U.S. at 193-94 (distinguishing the obtaining of final administrative action (required) from the exhaustion of judicial remedies (not required))); *also* citing *Steffel v. Thompson*, 415 U.S. 452, 472-73 (1974) (noting the general rule that exhaustion of state remedies is not a prerequisite to a § 1983 action). In *Montgomery*, like the case at hand, there was no doubt that the plaintiff had received a final administrative action. *Id.* at 768 (finding a physical invasion had occurred).

The Sixth Circuit concluded that to the extent that a plaintiff claims that her property was taken for a private use, the claim is ripe and the plaintiff may sue immediately without resorting to state remedies *Id.* at 771. Both the Fifth and Ninth Circuits have also followed this line of reasoning. *See Samaad v. City of Dallas*, 940 F.2d 925 (5th Cir. 1991) (holding that a private-purpose takings claim was immediately ripe for judicial determination); *Armendariz v. Penman*, 75 F.3d 1311, 1320-21 & n. 5 (9th Cir. 1996) (*en banc*) ("Because a 'private taking' cannot be constitutional even if compensated, a plaintiff alleging such a taking would not need to seek compensation in state proceedings before filing a federal takings claim under the rule of *Williamson County* . . . ."). The Sixth Circuit stated that the approach of the Seventh Circuit articulated in *Covington Court* imposed a judicial exhaustion requirement that *Williamson County* does not require. Because we find that the Daniels claim

(continued...)

Under *Williamson County*, federal courts are precluded
from adjudicating a claim of a taking for a private purpose
until litigants have met two requirements: "(1) the 'Final
Decision Requirement': the plaintiff must demonstrate
that he or she received a 'final decision' from the relevant
government entity; and (2) the 'Exhaustion Requirement':
the plaintiff must have sought 'compensation through
the procedures the State has provided for doing so.'"
*Forseth*, 199 F.3d at 372 (citing *Williamson County*, 473 U.S.
at 186-87, 194; *see also Unity Ventures v. County of Lake*, 841
F.2d 770, 774-75 (7th Cir. 1988); *Hager v. City of West
Peoria*, 84 F.3d 865, 869 (7th Cir. 1996)).

### 1. Final decision requirement.

Under the ripeness analysis of *Williamson County*, the
plaintiff's first requirement is to show that he received a
final definitive determination by the agency responsible
for deciding the permitted development on the land. *See
MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340,
351, (1987); *Williamson County*, 473 U.S. 172 at 193-94. Thus,
to determine whether the Plan Commission's actions con-
stitute a final decision, we turn to Indiana law to ana-
lyze whether the plat vacation statute imposed additional
administrative responsibilities on the Daniels. Indiana law
provides that "the approval, disapproval, or imposition
of a condition on the approval of the vacation of all or

---

[6] (...continued)
satisfies the futility exception to *Williamson County's* ripeness
requirement, see infra § III, B, we need not resolve the tension
between this circuit's and the Sixth Circuit's reading of *Williamson
County.*

part of a plat is a final decision of the plan commission" and may be appealed to a court for review. Ind. Code § 36-7-3-11(h). In this case the Plan Commission approved HNS' petition for vacation of the Lots and covenants in Broadmoor. Although the Plan Commission conditioned the final vacation on the approval of the development plan by various utility providers, both an approval of a plat vacation and the imposition of a condition on a plat vacation constitutes a final decision. *Id.* Therefore the Plan Commission's plat and covenant vacation of the Lots from Broadmoor's plat satisfied *Williamson County's* final decision requirement.

## 2. Exhaustion requirement.

Under the second requirement for ripeness imposed by *Williamson County*, the plaintiff must seek compensation from the state prior to proceeding to federal court. The Supreme Court has explained that *Williamson County's* exhaustion requirement "stems from the Fifth Amendment's proviso that only takings without 'just compensation' infringe that Amendment." *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 734 (1997). The Court reasoned that, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.*" Id.* (citation and quotation omitted); *see also Williamson County*, 473 U.S. at 194 n. 13 ("[B]ecause the Fifth Amendment proscribes takings *without just compensation*, no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action.") (emphasis in original); *Gamble*, 5 F.3d at 286 ("[U]ntil he

exhausts his remedies for obtaining a compensation award or equivalent relief from the state . . . [a landowner] cannot know whether he has suffered the only type of harm for which the just-compensation provision of the Constitution entitles him to a remedy.") (internal citations omitted). The Plan Commission argues that the Daniels' claim is not ripe because they failed to exhaust their available state law remedies by either seeking statutory certiorari review of the Plan Commission's decisions, *see* Ind. Code § 36-7-4-1004, or suing for inverse condemnation. *See* Ind. Code § 32-24-1-16.[7]

Initially we note that the Plan Commission's claim that the Daniels should have sought state certiorari review is clearly not required by *Williamson County.* The only remedies available to plaintiffs under certiorari review of a covenant vacation are reversal, affirmation or modification. *See* Ind. Code § 36-7-4-1009, 1016. In *Williamson County*, the Court specifically contrasted this type of review procedure, and "those for obtaining a declaratory judgment . . . with procedures that allow a property owner to obtain compensation for a taking. Exhaustion of review procedures is not required." *Williamson County*, 473 U.S. at 194 n. 13 (citing *Patsy v. Board of Regents of Florida*, 457 U.S. 496 (1982)). The Court concluded that Takings Clause litigants need only exhaust "procedures for obtaining compensation before bringing a § 1983 action." *Id.*

However, the availability and adequacy of an inverse condemnation claim in state court is a different matter. In *SGB Financial Services, Inc. v. Consolidated City of Indiana-*

---

[7] In 2002, Ind. Code 32-24-1-16 replaced the prior inverse condemnation statute, Ind. Code 32-11-1-12, which was relied on by both parties. The new statute is substantively identical to its predecessor.

*polis-Marion County, Indiana*, 235 F.3d 1036, 1037-38 (7th Cir. 2000) this court applied the inverse condemnation requirements of *Williamson County* to Takings Clause litigants in Indiana. In *SGB*, the plaintiff, SGB, owned 26 buildings in the Timber Ridge Apartment complex in the City of Indianapolis. The city put SGB's buildings on its "acquisition list" of properties. SGB claimed that by listing their properties, the city had accomplished a taking because no potential purchaser would be willing to pay the pre-listing value once the properties were designated for possible condemnation. *Id.* at 1037. We dismissed SGB's claim because the plaintiff failed to take advantage of Indiana's inverse condemnation proceedings before filing the federal suit. *Id.* (citing Ind. Code § 32-11-1-12). We held that because the Takings Clause "does not forbid takings but simply requires 'just compensation' for the property, a state violates the Constitution only by refusing to pay up." *Id.* Accordingly, in *SGB* we concluded that "[a] final decision about the disposition of the plaintiff's property, coupled with a lack of any financial remedy . . . could satisfy both [prongs of *Williamson County*]." *Id.* at 1038.[8]

Generally an inverse condemnation comes into play when property not actually taken or condemned is detrimentally affected by a threatened condemnation or the actual condemnation of an adjoining parcel of land. For example if condemnation of parcel A limits access to (or even landlocks) parcel B, the owner of parcel B could have

---

[8]  *Cf. Hoehne v. County of San Benito*, 870 F.2d 529, 533 (9th Cir. 1989) (takings claim ripe for review because California did not provide an inverse condemnation remedy at time of the alleged taking); *Corn v. City of Lauderdale Lakes*, 816 F.2d 1514, 1517 (11th Cir. 1987) (takings claim ripe for review because Florida did not recognize inverse condemnation suits).

a cause of action for the diminished value of his parcel that was not actually taken. After utilizing a state remedy, such as a suit for inverse condemnation, if the owner does not receive what he believes is just compensation, he may proceed with a Takings Clause claim in federal court. But what happens with a condemnation that leaves no diminished value to the property of an adjacent owner? That is the question before us.

The Daniels did not file a state inverse condemnation action prior to filing their § 1983 claim in federal court. They claim that while under *Williamson County* they would normally be required to seek compensation through the state court's inverse condemnation proceedings, under the facts of this case, such a proceeding would be futile because there is no monetary loss that begs compensation. Therefore they insist that their federal claim is ripe.[9]

In *Williamson County*, the Supreme Court adopted a limited exception to its exhaustion requirement based on the futility of seeking state court relief. Specifically, the Court held that a plaintiff may be excused from the exhaustion requirement if he demonstrates that "the inverse condemnation procedure is unavailable or inadequate." *Williamson County*, 473 U.S. at 197. If inverse condemnation is inadequate, i.e., where compensation for diminished value is not an issue, resorting to that remedy would

---

[9] In this manner the case presented before us is distinguished from *Forseth, Covington Court* and *Gamble.* In all three of those cases, the plaintiffs had incurred pecuniary damages from an adverse zoning decision. *See Forseth*, 199 F.3d at 366*; Covington Court*, 77 F.3d at 178; *Gamble,* 5 F.3d at 285. *See also Conniston Corp.*, 844 F.2d at 466 (stating in a case where the plaintiff alleged a taking for private purpose that the "the rejection of the plaintiffs' site plan probably reduced the value of their land.").

be futile. Accordingly, we turn to the question of whether, given the facts of this case, Indiana's inverse condemnation procedure while "available" is nevertheless inadequate.

In Indiana, an inverse condemnation action is one "against an entity with the power to condemn (usually a governmental defendant) to recover the value of property which has been taken in fact, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *City of Gary v. Belovich*, 623 N.E.2d 1084, 1095 n. 1 (Ind. Ct. App. 1993). Moreover, under Indiana law, an inverse condemnation action is an action at law limited to monetary compensation. *See Dible v. City of Lafayette*, 713 N.E.2d 269, 274 (Ind. 1999); *Indiana Dept. of Trans. v. Southern Bells, Inc.*, 723 N.E.2d 432, 434 (Ind. Ct. App. 1999). However, the manner in which the Plan Commission allegedly took the Daniels' property leaves them without a definable pecuniary loss. The Daniels' property value has not decreased as a result of the Plan Commission's action. In fact, prior to granting a plat vacation petition a plan commission must find, as it did here, that the surrounding plat will suffer no injury to the value of their land. Ind. Code § 36-7- 3-11(e). The Code provides, in pertinent part, as follows:

> The plan commission shall approve the petition for vacation of all or part of a plat only upon a determination that:
>
> . . .
>
> 3. the value of that part of the land in the plat not owned by the petitioner will not be diminished by vacation.

In this case the Plan Commission found that the value of the land in the plat would not be diminished because

> redevelopment of the site for commercial uses will re-

> quire development plan review by the plan commission. This review will address land use compatibility issues resulting from commercial use of the property, and will preserve property values in the remainder of the subdivision. The uninhabited and deteriorating residential structures would be removed from the site.

The Plan Commission does not dispute this admission on appeal. In fact, the Daniels' property value may have even increased, at least according to HNS' assertion to the Plan Commission that property values will be enhanced by the commercial development.[10] Both parties effectively agree that vacating the plat and the covenant did not diminish the value of the Daniels' property. Therefore, a suit for monetary relief under Indiana's inverse condemnation proceedings would be futile, if not frivolous.

This does not mean that a taking has not occurred, or that the Daniels are not entitled to relief.[11] Indiana courts have held injunctive relief instead may be necessary to remedy interference with a landowner's property rights

---

[10] Whether a taking in violation of the Fifth Amendment exists under these circumstances is a separate issue and one discussed *infra* at III, 2.

[11] *Cf. Duke Power Co. v. Carolina Environ. Study Group, Inc.*, 438 U.S. 59, 71 n. 15 (1978) ("[The Declaratory Judgment Act] allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained."); *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992) ("the district court should accept jurisdiction over takings claims for injunctive relief in the few cases where a Claims Court remedy is 'so inadequate that the plaintiff would not be justly compensated.' " (citation omitted)).

for a private purpose. *See Indiana Dept. of Trans. v. Southern Bells*, 723 N.E.2d 432, 434 (Ind. Ct. App. 1999). *Cf. Pulos*, 302 N.E.2d at 771 (holding that a governmental entity cannot take private property for a private purpose). But under Indiana law, purely equitable relief—a reversal of the rezoning and the eradication of the covenant and plat—is unavailable under the inverse condemnation procedure. *See Southern Bells*, 723 N.E.2d at 434. Accordingly, with no monetary loss and injunctive relief not an available option under the statute, the inverse condemnation procedure is inadequate to address the Daniels' injury. Under *Williamson County* this futility exempts them from the exhaustion requirement.[12] Therefore, the Daniels have satisfied the Takings Clause ripeness requirements of *Williamson County*, and the court has subject matter jurisdiction to hear the merits of the case.[13]

---

[12] Of course, the Daniels had the option of bringing their claim for equitable or declaratory relief in state court, but they were not required to do so under *Williamson County's* ripeness requirements.

[13] The Daniels eventually amended their complaint to include a facial challenge to the constitutionality of the statute. Litigants are not required to meet the *Williamson County* ripeness requirements when solely mounting a pre-enforcement facial challenge to the constitutionality of a statute under the Fifth Amendment. *Yee v. City of Escondido*, 503 U.S. 519, 533 (1992); *Triple G Landfills, Inc. v. Board of Commissioners of Fountain Cty., Indiana*, 977 F.2d 287 (7th Cir. 1992). In this case the Daniels did not mount a facial challenge to the statute until after it had been enforced to their detriment. While we see no reason why enforcement would change the ripeness requirements of a purely facial challenge, this finding would not impact the ripeness of their separate as-applied challenge under *Williamson County*.

### B.  Takings for a Public Purpose

Having concluded that the Daniels' takings claim is ripe, we now proceed to the merits. We first address whether the vacation statute was applied unconstitutionally to the Daniels and then address their facial challenge. *Cf. Renne v. Geary*, 501 U.S. 312, 324 (1991) (facial challenge should generally not be entertained when an "as-applied" challenge could resolve the case). The Daniels allege that the Plan Commission violated § 1983 by acting under the color of state law to take their property in violation of their constitutional rights. The Daniels argue that the covenant vacation was a taking for private purpose in violation of their rights under the Fifth and Fourteenth Amendments to the Constitution and Article 1, §§ 21, 23 of the Indiana Constitution.[14] In this case, the Plan Commission

---

[14] The Daniels' theory of the case has consistently been that the taking in this case resulted in a violation of the Takings Clause as opposed to a violation of their substantive due process rights. We have had an opportunity in the past to examine whether a taking for private purpose claim is more properly analyzed under the standards of the Fourteenth Amendment Due Process Clause or the Takings Clause of the Fifth Amendment. *See Forseth*, 199 F.3d at 369-70; *Covington Court Ltd. v. Village of Oak Brook*, 77 F.3d 177, 179-80 (7th Cir. 1996); *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 464-66 (7th Cir 1988). We have also recognized that plaintiffs may maintain a substantive due process claim to contest land use decisions. *See, e.g., Doherty v. City of Chicago*, 75 F.3d 318, 325 (7th Cir. 1996). However, in our latest discussion of this issue we held that we will analyze a taking for a private purpose claim under the Takings Clause. *See Forseth*, 199 F.3d at 369 n. 8 (stating, "there is authority that when a taking is made for wholly private use, the takings clause and not substantive due process provides the analytical frame-
(continued...)

asserts that it was entitled to summary judgment because the undisputed facts demonstrate that the restrictive covenants on the Lots were vacated in the public interest. We review *de novo* the district court's decision to grant summary judgment to the Daniels, construing all facts, and drawing all reasonable inferences from those facts, in favor of the Plan Commission, the party against whom the motion under consideration was made. *See Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 352 (7th Cir. 2002). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Takings Clause of the Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation." This limitation on governmental power has been imposed on the States through the Fourteenth Amendment, *see Phillips*, 524 U.S. at 163; *Chicago, Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226, 239 (1897). The Constitution only protects, rather than creates,

---

[14] (...continued)

work."). *See also Armendariz v. Penman*, 75 F.3d 1311, 1325-26 (9th Cir. 1996) (holding that if the Takings Clause applies to an alleged violation, no substantive due process claim applies. "Substantive due process analysis has no place in contexts already addressed by explicit textual provisions of constitutional protection, regardless of whether the plaintiff's potential claims under those amendments have merit."). Because the Daniels have chosen to frame their claim as an improper taking for a private purpose in violation of the Fifth Amendment, we see no need to readdress the issue in this case.

property interests, therefore the existence of a property interest is determined by reference to "existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *see also Chapman v. Sheridan Wyo. Coal Co.*, 338 U.S. 621, 626-27 (1950) (finding that a restrictive covenant was a property right similar to an easement by relying on state common law).

The property interest at issue here is the restrictive covenant that was included in the plat of Broadmoor limiting construction in the plats to single-family residences. By removing the Lots from the Plat and the restrictive covenants included therein, the Plan Commission has prevented the enforcement of the residential covenant against the current or future owners of the Lots. Under Indiana law it is well established that a restrictive covenant constitutes a constitutionally protected property interest. *Pulos v. James*, 302 N.E.2d 768, 771 (Ind. 1973). It is a covenant that runs with the land and "creates a property right in each grantee and subsequent grantee of a lot in the plat subject to the restriction." *Id.* (citing *Wischmeyer v. Finch*, 107 N.E.2d 661 (Ind. 1952)).[15] The Daniels,

---

[15] Indiana courts have also held that a restrictive covenant is a "species of express contract," *Columbia Club, Inc. v. American Fletcher Realty Corp.*, 720 N.E.2d 411, 417 (Ind. Ct. App. 1999), subject to the Contracts Clause of the Indiana constitution. *Clem v. Cristole*, 582 N.E.2d 780, 782 (Ind. 1991). While Indiana has recognized that a restrictive covenant is both a property right and a contract right, in the context of takings jurisprudence, Indiana has indicated that a restrictive covenant may only be taken for a public purpose. *See Pulos*, 302 N.E.2d at 772-75; *see also, Dible*, 713 N.E.2d at 274. ("Our precedents, and today's holding, clearly indicate that where a governmental entity

(continued...)

as owners of the right to enforce the covenant pursuant to their ownership of a lot in Broadmoor, may no longer prevent commercial development in the Lots, which were in the original plat of Broadmoor. Because they have been dispossessed of this enforcement ability by the Plan Commission, they have demonstrated a property right that has been taken by state action. *See Dible*, 713 N.E.2d at 274.

Next, we look to the Daniels' claim that their property was taken not for a "public use." The Supreme Court has held that implicit in the Fifth Amendment is a requirement that the government not take property for private purposes: "one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." *Thompson v. Consolidated Gas Utils. Corp.*, 300 U.S. 55, 80 (1937). *See also, Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void.").[16]

---

[15] (...continued)
violates restrictive covenants in furtherance of a public use or purpose, that violation is a taking for which compensation must be paid.")

[16] *See also Cincinnati v. Vester*, 281 U.S. 439, 447 (1930); *Madisonville Traction Co. v. St. Bernard Mining Co.*, 196 U.S. 239, 251-52 (1905); *Fallbrook Irrigation Dist. v. Bradley*, 164 U.S. 112, 158 (1896); *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) (Chase, J.) (noting that because "[i]t is against all reason and justice, for a people to entrust a Legislature with such powers" as the power to enact "a law that takes property from A and gives it to B," the legislature cannot be presumed to have such powers).

Even though the Supreme Court has required the existence of a public use to justify a taking, the burden on the state is remarkably light. When a state's exercise of eminent domain power is "rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." *Midkiff*, 467 U.S. at 241 (citing *Berman v. Parker*, 348 U.S. 26 (1954)).[17] Due to the "rational relationship" test, the

---

[17] We made a similar observation in 1993 in *Gamble v. City of Eau Claire*, noting that we could find "no case in the last half century where a taking was squarely held to be for a private use." *See Gamble*, 5 F.3d at 287. However, several courts have recently found unconstitutional takings that were for a private use. *See, e.g., 99 Cents Only Stores v. Lancaster Dev. Agc'y*, 2001 WL 811056 (C.D. Cal. 2001) (holding that a plan condemning commercially viable real property in order to transfer it to a potentially more lucrative private entity was a private taking); *Southwestern Ill. Dev. Auth. v. National City Environmental, L.L.C.*, 768 N.E.2d 1 (Ill. 2002) (holding that a taking of a recycling facility's property to convey to a racetrack for the purpose of expansion of its parking lot was unconstitutional as it would not achieve a legitimate public use). *Cf. Tolksdorf v. Griffith*, 626 N.W.2d 163 (Mich. 2001) (holding that the Opening of Private Roads and Temporary Highways Act was unconstitutional as it authorized the taking of private property for a predominantly private purpose). *See also Pulos v. James*, 302 N.E. 2d 768 (Ind. 1973) (holding that a statute authorizing Metropolitan Plan Commission or its committee to vacate covenants or restrictions applying to subdivided real estate where such restrictions were contained in recorded plan was invalid as authorizing taking of property for private purpose); *Port Authority of the City of St. Paul v. Grippoli*, 202 N.W.2d 371 (Minn. 1972) (holding that the condemnation of property and subsequent transfer to a different private interest under a thirty-year lease

(continued...)

Court has held that "the 'public use' requirement is thus coterminous with the scope of a sovereign's police powers." *Id.* However, while the scope of judicial scrutiny is narrow, "[t]here is, of course, a role for courts to play in reviewing a legislature's judgment of what constitutes a public use," *id.*, although this role is very limited when the legislature has determined what constitutes a public use. *See National Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1127 (7th Cir. 1995) ("a legislative decision 'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'") (citing *FCC v. Beach Communications, Inc.,* 508 U.S. 307 (1993)). Therefore, to the extent that the decisions of the Area Plan Commission fall under specific Indiana legislative determinations of public use, they should not be disturbed unless the decision is "palpably without reasonable foundation." *Midkiff* at 241.

In this case, however, the legislature has not made a specific determination of what constitutes a "public use" under Ind. Code 37-7-3-11(e) and instead has delegated that duty to the local Plan Commission. *See* Ind. Code 37-7-3-11(e) ("a plan commission shall approve the petition for vacation of all or part of a plat only upon a determination that . . . it is in the public interest to vacate all or part of the plat."). This has not been the situation in prior case law prescribing deference to state "public use" determinations. For example, in *Midkiff,* the Court ruled that the decisions of the Hawaii Housing Authority in determining whether state acquisition of a certain tract of land effectuated the public purposes of the Land Reform

---

[17] (...continued)
without change in the character of the property was a taking for private purpose).

Act of 1967, as passed by the Hawaiian Legislature, would not be disturbed unless shown to be irrational. *Midkiff* at 242. Similarly in *Berman v. Parker*, 348 U.S. 26 (1954), the Court upheld the taking of private property that the government intended to reconvey to other private persons because the taking was part of a legislatively enacted plan to remove blight found by the legislature to be for public good. And finally, in *United States ex rel. TVA v. Welch*, 327 U.S. 546, 552 (1946), the Court stated that "it is the function of Congress to decide what type of taking is for a public use and that the agency authorized to do the taking may do so to the full extent of its statutory authority." *Midkiff*, *Berman* and *Welch* differ from our situation in that the condemning state agencies were not free to create a public purpose out of whole cloth but instead were limited to findings of public purpose established by the legislature. *See Midkiff*, 467 U.S. at 233-34; *Berman*, 348 U.S. at 28-30; *Welch*, 327 U.S. at 552.

Instead we are faced with a situation where a local plan commission is making legislatively unrestrained decisions as to what constitutes a public use. The Ninth Circuit has warned that takings made by local agencies without legislative authority serve to undermine the public use requirement. *See Armendariz v. Penman*, 75 F.3d 1311, 1321 (9th Cir. 1996). The court noted that "[if] officials could take private property, even with adequate compensation, simply by deciding behind closed doors that some other use of the property would be a 'public use,' and if those officials could later justify their decisions in court merely by positing 'a conceivable public purpose' to which the taking is rationally related, the 'public use' provision of the Takings Clause would lose all power to restrain government takings." *Id.* Therefore, to the extent that the Area Plan Commission's determination of a use that is in the public interest falls outside Indiana's legislative defini-

tions of "public use" in other areas of state law, they will not be given the almost complete deference that the Court has afforded legislative determinations. *Cf. Cinncinnati v. Vester*, 281 U.S. 439, 448 (1930) (holding that condemnation proceedings by a municipality exercised outside the grant of authority conferred by the legislature were void).

In this case, pursuant to Indiana Code § 36-7-3-11(e) the Plan Commission determined that the vacation was in the public interest because "it would allow the site to be redeveloped with commercial uses which could be a more appropriate use for the property and could be a benefit to the immediate neighborhood. The uninhabited and deteriorating residential structures would be removed from the site." In approving the rezoning and primary development plan, the Plan Commission also made several findings of fact:

(1) Nearby commercial development and increased traffic along Lima Road have made this property less desirable for residential use.

(2) Redevelopment of the site for commercial uses will require development plan review by the plan commission. This review will address land use compatibility issues resulting from commercial use of the property, and will preserve property values in the remainder of the subdivision.

(3) The proposed redevelopment of the site would create a commercial development which could be an asset to the surrounding neighborhood. Site development plan review will mitigate any negative impacts on the adjacent residential properties.

(4) The proposed rezoning will establish a desirable precedent in the area because: it will continue the

established precedent for commercial development or redevelopment of properties fronting on Lima Road in this area.

At the same time that the Plan Commission approved the covenant vacation, it also rezoned the area for commercial uses and conditionally approved HNS's development plan for the Lots that provided for a development of a 12,000 sq. ft. commercial space. Based on a plain reading of the Plan Commission's findings it is apparent that the public benefit of the vacation and zoning action will not materialize absent any promised commercial development of the Lots by HNS or a subsequent owner. HNS is thus the primary beneficiary of the vacation of the restrictive covenant, and not Allen County. The direct benefit to HNS is emphasized further by the fact that rather than build the proposed shopping center, the property is currently up for sale as commercial property for $695,000. The residents of Allen County will see none of the possible improvement in their health, safety and welfare until HNS either sells the property to a potential developer or commercially develops the property itself. This private benefit does not necessarily doom the covenant vacation under current takings jurisprudence, as even takings that transfer property from one private person to another have been deemed valid as long as there is a public purpose underlying the transfer. *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 245 (1984). However in this case there is no rationally related public purpose as defined by either the Indiana legislature or the Plan Commission to support the private taking.

### 1.  Legislatively Determined Public Purposes

The Plan Commission's stated purpose for the covenant vacation is the development of commercial property and

the removal of empty homes. The Indiana legislature has addressed, in other enactments, the public purpose requirement of eminent domain procedures in areas of commercial development and vacated homes in blighted areas. The Plan Commission's statement of public use fails under either scenario.

First, under Indiana law, the Plan Commission may not condemn property if "commercial development" is the sole public purpose. In Indiana, local governments may designate areas "economic development areas" and establish redevelopment commissions based on findings that increased development in the region will promote employment, attract a new business enterprise, increase the property tax base, improve diversity of the economic base and create other similar benefits. Ind. Code 36-7-14-41 (b)(4). Redevelopment commissions have several powers in economic development zones including purchasing, selling and leasing property, maintaining structures, providing financial assistance to local entities, and contracting to construct necessary structures. Ind. Code 36-7-14-12.2. However, Ind. Code 36-7-14-43(a)(7) specifically prohibits a commission from exercising the right of eminent domain in an economic development area. *See also, Evansville v. Reising*, 547 N.E.2d 1106, 1110 (Ind. Ct. App. 1989). Similarly, local commissions may not use eminent domain for industrial development but instead may only "acquire by purchase, gift, or devise, and own, improve, maintain, sell, lease, convey, contract for, or otherwise deal in, real property for the development of industrial parks or industrial sites." Ind. Code § 36-7-13-3. Therefore, the Indiana legislature has determined that economic development on its own does not constitute a public purpose sufficient to satisfy the public use requirement inherent in the exercise of eminent domain under Indiana law.

Instead, redevelopment commissions must treat an area as "blighted" in order to use eminent domain to achieve the purpose of commercial development. *Id.* at 1111-12. Under Indiana law the clearance of blighted areas constitutes a public purpose sufficient to enable the exercise of eminent domain. Ind. Code § 36-7-14-2(a) ("The clearance, replanning, and redevelopment of blighted areas under this chapter are public uses and purposes for which public money may be spent and private property may be acquired."). However, the determination of blight is a significant step that requires more than just a finding of a couple of vacant houses. *See* Ind. Code § 36-7-9-4.5. For vacant structures the Indiana legislature has authorized local governmental bodies to enact regulatory standards for repair and maintenance, and order repair or at most removal of the structure itself, providing certain procedural requirements are met. *Id.; see also* Ind. Code § 36-7-9-5.

Even if there were an argument that these structures constitute a blight, Indiana has established specific and detailed processes through which a local commission must go in order to make that determination. Ind. Code § 36-7-14-15. The code provides in part:

> Whenever the redevelopment commission finds that an area in the territory under their jurisdiction has become blighted to an extent that cannot be corrected by regulatory processes or the ordinary operations of private enterprise without resort to this chapter, and that the public health and welfare will be benefitted by the acquisition and redevelopment of the area under this chapter, the commission shall cause to be prepared:
>
> > (1) maps and plats showing:
> >
> > [the affected areas and designated public uses of those areas]

(2) lists of the owners of the various parcels of property proposed to be acquired; and

(3) an estimate of the cost of acquisition and redevelopment.

Ind. Code § 36-7-14-15.

Once these findings are made "the redevelopment commission shall adopt a resolution declaring that the blighted area is a menace to the social and economic interest of the unit and its inhabitants." *Id.* The resolution must then be submitted to the plan commission which determines whether the resolution and the redevelopment plan conform to the plan of development for the unit and approve or disapprove the resolution and plan proposed. Ind. Code 36-7-14-16.

Obviously, the Plan Commission did not pursue this statutory option. Instead, it simply justified the vacation based on conclusory and largely unsupported statements as to the state of the homes on HNS properties. Because the Plan Commission has neglected to follow the statutory requirements for determining blight, they cannot now rely on that legislatively determined public use in order to justify their taking. To hold otherwise would obviate the procedural requirements of Indiana's blight code. Because the Plan Commission has not relied on a legislative determination of public use, the traditional deference given to those determinations is not appropriate in this case.[18]

---

[18] While there are other legislatively defined public purposes in the Indiana Code, we are not aware of any which could justify a taking by the Plan Commission in this case. *See, e.g.,* Ind. Code 36-7-18-2 ("[t]he clearance, replanning, and reconstruction of

(continued...)

### 2. Plan Commission's Stated Public Purpose

Next we will examine whether the Plan Commission's stated public purpose satisfies the Fifth Amendment's public use requirement. As we have stated, the Court has held that the public use requirement is coterminous with the scope of a sovereign's police powers. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014 (1984) (citing *Midkiff*, 467 U.S. at 240 (1984)). *See generally* R. Epstein, *Takings* 108-112 (1985). Regulations enacted pursuant to the police power must be substantially related to the advancement of the public health, safety, morals, or general welfare. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926).[19] The Plan Commission argues

---

[18] (...continued)
the areas in which unsanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property may be acquired."); Ind. Code 36-9-11-5 (municipal parking facilities are public use); Ind. Code 36-9-2-17 (the improvement of drains in order to increase the public health is a public use).

[19] The Court has not defined, nor attempted to define when this test is met and has stated that "[a]n attempt to define its reach or trace [the police power's] outer limits is fruitless, for each case must turn on its own facts." *Berman*, 348 U.S. at 32. This standard, "substantially related to the advancement of the public health, safety, morals, or general welfare," of course is similar, if not functionally equivalent, to the first half of the test that the Court has used to determine when a regulation effects a taking. *See Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980) (holding that a land use regulation does not effect a taking if it "substantially advance[s] legitimate state interests" and does

(continued...)

that if the covenant is vacated, then HNS may develop the property in the future, thereby removing vacant houses and creating a commercial zone that may be an asset to the community. However this possible future public benefit, even combined with the possibility that HNS may decide to remove the vacant homes, is not substantially related to the advancement of the public health, safety or welfare.

First, this case contrasts sharply even with those cases where courts have pushed the limits of the Public Use Clause and have held that a state transfer of property to a private entity served a public interest. For example in *Poletown Neigh. Council v. City of Detroit*, 304 N.W.2d 455, 458 (Mich. 1981), the Michigan Supreme Court authorized a municipality to take private property for the development of a General Motors plant. In that case, the city of Poletown condemned a site approved by General Motors

---

[19] (...continued)
not "den[y] an owner economically viable use of his land."). Because of the vague nature of the test, the Court has struggled in regulatory takings scenarios with defining whether a public interest is legitimate, and whether a regulation is "substantially related" to that interest. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834-35 (1987). But it has noted that a "broad range of governmental purposes and regulations satisfies these requirements." *Id.* We need not test the limits of "substantially related" here, however, due to the completely private and prospective nature of the stated public interest served by the covenant vacation. Because the removal of the covenant only benefits the public if HNS benefits first, and even then if the commercial development is completed and successful, there is barely a rational relationship much less a substantial relation of the covenant vacation to the health, safety, and welfare of the local community.

under the authority of the Economic Development Corporations Act. *Id.* at 457. The court upheld the stated public purpose of a new General Motors plant, stating that "the city presented substantial evidence of the severe economic conditions facing the residents of the city and state, the need for new industrial development to revitalize local industries, the economic boost the proposed project would provide, and the lack of other adequate available sites to implement the project." *Id.* at 459. *Poletown* differs from the case at hand. There, the city made specific findings pursuant to a legislatively determined public use (under the Economic Development Corporations Act) as to the exact needs of the local community and the property was condemned for a specific type of economic development that met those needs and statutory requirements.

Similarly, in *Midkiff v. Hawaii Hous. Auth.*, the Supreme Court validated takings of private property for transfer to individuals under the Hawaii Land Reform Act. *Midkiff*, 467 U.S. at 233-34 (citing Haw. Rev. Stat. § 516 (1976)). The land reform statute allowed a local commission to target certain properties and permit the holders of long-term leases on those properties to purchase the leased property from the owners. *Id.* The Hawaiian legislature determined that ownership of land in Hawaii was so highly concentrated as to constitute a "land oligopoly"and thus allowed those transfers to occur without the landlords' consent. *Id.* These transfers were determined by the Court to be in the public interest because they would effect a decrease in land prices and an increase in land transfers. *Id.* at 240-241. In *Midkiff*, the actual act of the transfer, regardless of the proposed use of the property, was found to serve a public purpose.

Here there is no determination that commercial development in and of itself would serve some overriding pub-

lic purpose. In fact there is no limit as to the actual commercial or residential purposes that HNS may use the property. Under § 3-6-13-2 of the Allen County Zoning Ordinance land zoned C-2A may be used to provide "goods and services that meet day-to-day needs." However, owners of areas that are zoned C-2A may also use the property for most C-1A and C-1 uses such as "a service station, a tire store, a car wash, a laundromat, a tavern, a package liquor store, a massage salon, a bowling alley, a pool hall, billboards, and manufactured or mobile homes." *See Daniels*, 125 F. Supp. 2d at 351. As the Daniels point out, the impact on the community depends on the use to which the property is put, and without knowing the use, the Plan Commission could not reasonably find that the vacation of the covenant could benefit the community.[20] The only common feature to all of the potential future commercial uses of the Lots would be to confer a private benefit on HNS either through their own development of the Lots or the sale of the property to a developer. The underlying purpose of a government taking that transfers a property interest to a private entity must be for a public benefit, and in this case any speculative public benefit would be incidental at best.

Secondly, the Plan Commission did not find that any eventual commercial development *would* be an asset to the community, merely that it *could* be an asset to the community. This type of possible public use does not satisfy the Fifth Amendment requirements. The Supreme

---

[20] For example, if HNS chose not to commercially develop the property but instead sold the Lots for residential uses, then the Plan Commission plat vacation would have no effect on the plat or local community. If there is no effect on a local community then there can be no public purpose.

Court has held that when there is a delegation of power to a local government to determine a public use, "it is not enough that property *may be devoted hereafter* to a public use for which there may be an appropriate condemnation." *Vester*, 281 U.S. at 448 (holding that a public use declaration that an excess condemnation was in "furtherance of the public use" was not suitably defined enough to justify the taking under a state law requiring that condemnations be supported by a public use) (emphasis added).[21] The Plan Commission argues in response that we should not just consider the actual purposes that were considered, but also any *"conceivable* public purpose." *See Gamble*, 5 F.3d at 287 (emphasis in original). However, that standard, as enunciated in *Midkiff*, has traditionally applied to state legislatively or congressionally designated public purposes employed to justify the use of eminent domain and so does not apply to independent findings by the Plan Commission that are unsupported by state code. *See Midkiff*, 467 U.S. at 244 ("Thus, if a *legislature, state or federal*, determines there are substantial reasons for an exercise of the taking power, courts must defer to its de-

---

[21] *But see Rindge Co. v. Los Angeles*, 262 U.S. 700, 707 (1923) ("In determining whether the taking of property is necessary for public use not only the present demands of the public, but those which may be fairly anticipated in the future, may be considered." (citing *Central Pacific Railway v. Feldman*, 152 Cal. 303, 309 (Cal. 1909)). In *Rindge* the Court was considering an eminent domain procedure to expand the highway system in Los Angeles to alleviate traffic concerns. *Id.* at 308-09. In this case, the Plan Commission has not pointed to future needs of the community, especially on the scale of the future traffic problems of Los Angeles, but instead stated that commercial development "could be a more appropriate use for the property and could be a benefit to the immediate neighborhood."

termination that the taking will serve a public use." (emphasis added)). *See also Armendariz*, 75 F.3d at 1321. Even so, while in this case there may be some conceivable public benefit of some possible future use of the property, that benefit will always be subservient to the future private uses of the Lots, and therefore private benefits, by HNS. Much like the value of the property taken, "public use" is to be determined at the time of the taking, and at the time of the taking of the restrictive covenant, the possible future commercial development could not be rationally described as for a public purpose. *Cf. Coniston Corp.*, 844 F.3d at 463 ("The taking is complete when it occurs . . . .") (citing *First Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 320 (1987)). The public use requirement would be rendered meaningless if it encompassed speculative future public benefits that could accrue only if a landowner chooses to use his property in a beneficial, but not mandated, manner.

In sum, because the Plan Commission has not followed legislative determinations of what constitutes a valid public use, nor provided any facts that demonstrate that the covenant vacation is substantially related to a public interest, we conclude that the Plan Commission has violated the public use requirement of the Takings Clause by vacating the restrictive covenant for a private purpose.

## C. Facial Challenge

In addition to holding that the Plan Commission violated the Daniels' Fifth Amendment rights by vacating the restrictive covenant, the district court also held that Indiana Code § 36-7-3-11 was facially invalid under the Takings Clause. Subsection (e) of Indiana Code § 36-7-3-11 provides, in pertinent part:

> The Plan Commission shall approve the petition for vacation of all or part of a plat only upon determination that:
>
> > 1. Conditions in the platted area have changed so as to defeat the original purpose of the plat;
> >
> > 2. It is in the public interest to vacate all or part of the plat; and
> >
> > 3. The value of that part of land in the plat not owned by the petitioner will not be diminished by vacation.

Ind. Code § 36-7-3-11(e).[22]

A zoning regulation may be challenged on the basis that the "mere enactment" of the regulation is unconstitutional and constitutes a taking of property. *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980). However, when making such a challenge, plaintiffs face an "uphill battle." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987). To successfully claim that a zoning restriction is unconstitutional on its face, plaintiffs must show either that it does not substantially advance legitimate state interests or that it denies them economically viable use of their land. *Agins*, 447 U.S. at 260; *Lake Nacimiento Ranch v. County of San Luis Obispo*, 841 F.2d 872, 877 (9th Cir. 1987). Moreover, to mount a successful facial challenge the plaintiff "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

---

[22] This current version of § 36-7-3-11 incorporates amendments to the statue made in 1981 and 1986 after the Indiana Supreme Court found that it unconstitutionally permitted takings without a public purpose. *Pulos v. James*, 302 N.E.2d 768, 770-71 (1973).

The Daniels argue that Indiana Code § 36-7-3-11 is facially invalid because it does not define what constitutes a public purpose. However, neither the Supreme Court nor this court has ever required a specific legislative statement as to the limits of a public purpose to avoid a Fifth Amendment facial challenge. It is true that in determining if the state action satisfies the Fifth Amendment's Public Use Clause the Supreme Court has relied primarily, if not exclusively, upon legislative determinations of public purposes within the taking statute. *See, e.g., Hawaii Housing, Auth. v. Midkiff*, 467 U.S. 229, 239-42 (1984). However the Court has never held that the sole source of a definable public use is the specific takings-enabling statute. Indeed because the power of eminent domain is coterminous with the police power, as long as a taking is substantially related to the advancement of the health, safety and welfare of the public it is constitutionally sound under the Public Use Clause. *Id.*

Also, the United States Constitution does not prescribe any particular allocation or separation of powers among the states. *See Markham v. Clark*, 978 F.2d 993, 995 (7th Cir. 1992). Thus, at least for Fifth Amendment purposes, the Indiana legislature was free to delegate the authority to determine public purpose to another branch or unit of the government. *See, e.g., Wisconsin Central Ltd. v. Public Service Comm'n of Wisconsin*, 95 F.3d 1359, 1368-69 (7th Cir. 1996) (no constitutional violation where agency-written rules delegated to utilities the authority to determine whether a particular taking had a public purpose; takings claimants had right to judicial review); *United Beverage Co. of South Bend, Inc. v. Indiana Alcoholic Beverage Comm'n*, 760 F.2d 155, 157-58 (7th Cir. 1985) (no general federal constitutional doctrine limiting a state legislature's delegation of legislative authority to an administrative agency). *Cf. Rindge Co. v. Los Angeles Co.*, 262 U.S. 700, 709 (1923)

*(*"The necessity for appropriating private property for public use is not a judicial question. This power resides in the Legislature, and may either be exercised by the Legislature or delegated by it to public officers."). The legislature did in fact delegate this authority when it authorized the Plan Commission to determine whether to vacate plats for a public purpose.

Even assuming, *arguendo,* that the Daniels could show that the covenant vacation statute was an impermissible delegation of legislative authority under Indiana law, *see, e.g., Telecommunications Ass'n of Indiana, Inc. v. Indiana Bell Tel. Co.,* 580 N.E.2d 713, 716 (Ind. Ct. App. 1991) (recognizing that under Indiana law, some delegations of legislative authority are impermissible), their claim does not implicate federal law but instead should have been brought in the Indiana courts. A "failure to implement state law violates that state law, not the Constitution; the remedy lies in state court." *River Park v. City of Highland Park,* 23 F.3d 164, 166-67 (7th Cir. 1994). In any event, while § 36-7-3-11 does not specifically define a public use, it clearly requires that a public use exist so as to justify a plan commission's action.

The Daniels further challenge the procedures authorized by Indiana Code § 36-7-3-11 because those procedures demonstrate that the statute authorizes takings for private purpose. Under the procedures mandated by the statute, the Daniels claim that plat vacations only occur when a private individual requests that a plan commission alter plats (to the possible detriment of other private individuals) solely for the petitioner's benefit. As a result, even though a typical petitioner could not have any motive for making a request other than for his sole benefit, the Plan Commission need only make conclusory, written findings that the vacation of the covenants is "in the public interest."

The statute, however, is not that porous. As stated above, the Public Use Clause is only violated if a person's property is "taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." *Thompson*, 300 U.S. at 80. Therefore, even if a petitioner applies for a plat vacation for a private benefit, if there is a justifying public purpose then the Fifth Amendment is not violated. Additionally, a local plan commission is not completely without guidance under 36-7-3-11(e). Specifically all or part of a plat may only be vacated if "conditions in the platted area have changed so as to defeat the original purpose of the plat," Ind. Code 36-7-3-11(e), and "it is in the public interest to vacate all or part of the plat." These limits sufficiently direct a plan commission to act only in concert with the Fifth Amendment. Of course, as demonstrated in this case, a commission may fail to follow those directions. While the Daniels have been subject to an unconstitutional application of the statute because the taking of their property was not in the public interest, this does not render the statute unconstitutional in every aspect. Under the *Salerno* standard we can envision several scenarios where a plan commission could comply with their statutory mandate and allow a proposed covenant vacation that is in the public interest. For example, the plan commission could vacate a covenant if it was rationally related to a public interest already authorized by legislative enactment. Also, the plan commission could find that the vacation would substantially advance the health, safety and welfare of the community. For example if the commission found that an area was under-served by doctors' or dentists' offices, or day care facilities, and the vacation would substantially serve to fill that need, then the vacation could be found to be in the public interest. Therefore, since the covenant vacation statute has potential constitutional applications, this facial attack fails. *See*

*Salerno*, 481 U.S. at 745. In conclusion, the Daniels have not shown that Indiana Code 36-7-3-11 is unconstitutional because the statute expressly requires that vacations be in the public interest, and does not delegate public use determinations in violation of the Federal Constitution.

## IV.

In conclusion, the district court properly asserted subject matter jurisdiction over the Daniels' claim, although not under *Patsy*, but because they were exempted from *Williamson County's* ripeness requirements due to futility. The district court also properly concluded that Indiana Code 36-7-3-11 was unconstitutionally applied against the Daniels by effectuating a public taking for a private purpose. However the district court improperly found that Indiana Code 36-7-3-11 was unconstitutional on its face. The statute could be constitutionally applied and the Constitution does not prohibit specific delegations of state legislative power. For these and the foregoing reasons we AFFIRM the injunction against the Plan Commission from vacating the restrictive covenant of the Broadmoor Addition for a private purpose, but REVERSE the district court decision finding Ind. Code § 36-7-3-11 facially unconstitutional.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*